[No. S040703. Dec. 15, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ROBINSON, JR., Defendant and Appellant.

COUNSEL

Susan K. Marr, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, C. J.—Defendant James Robinson, Jr., appeals from a judgment of the Los Angeles Superior Court imposing a sentence of death following his conviction of two counts of first degree murder of James White and Brian Berry (Pen. Code, § 187, subd. (a))[1] and one count of second degree robbery (*id.*, § 211). The jury found true both robbery-murder and multiple-murder

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

special-circumstance allegations. (§ 190.2, subd. (a)(3) & (17).) The jury also found true the allegations that defendant personally used a firearm in the commission of the offenses. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) After the initial penalty phase proceedings ended in mistrial, a new jury was selected to consider the question of penalty, and that jury fixed the punishment at death. In addition to imposing a judgment of death for each murder conviction, the trial court sentenced defendant to the midterm of three years for the robbery plus four years for the weapons enhancements. Defendant's appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. Facts

### A. *Guilt Phase Evidence*

#### 1. *The prosecution's case*

Defendant James Robinson, Jr., was a student at California State University, Northridge (CSUN), where he lived in a dormitory and had a part-time job on campus. In the spring of 1990 he had not paid his tuition or student fees and stopped attending classes. Defendant moved to a condominium, which he shared with roommates near the CSUN campus. In August 1990 he began a part-time job at a nearby Subway sandwich shop, where he worked for approximately five months. Stuart Schlosser, owner of the Subway shop, described defendant as a courteous and cooperative employee, but also noted that defendant and another employee had been "let go" after he (Schlosser) confronted them concerning money that was missing and warned that, if the money was not returned, they would be "terminated." After leaving employment at the Subway shop, defendant continued to patronize the shop and had pleasant interactions with Schlosser.

Defendant found a part-time job as a meat wrapper at a supermarket and remained there for three months. In April 1991 defendant's credit union assessed various overcharge fees and ultimately closed his checking account because he had written more than three overdrawn checks in the prior six months. A second supermarket hired defendant as a part-time employee in May 1991. Meanwhile, defendant's newspaper subscription was cancelled for lack of payment, and a debt collection agency pursued him concerning other obligations. Defendant cashed his paychecks at the supermarkets where he worked and kept most of his money in currency. The credit union ultimately reversed some of the overcharge fees, and defendant was able to honor each of the returned checks.

Defendant terminated his condominium lease in May 1991 and moved into an apartment occupied by Tai Williams (Williams), his friend since seventh grade. Williams shared that apartment with his girlfriend, Donna Morgan, and their baby daughter. During this period, defendant began to work full time for Lucky's supermarket in the meat department, where he met Dennis Ostrander (Ostrander), who occasionally loaned defendant money for lunch or busfare.

Williams owned a gun, as did another mutual friend, Tommy Aldridge (Aldridge), whom defendant also had known since seventh grade. Williams frequently took defendant and Aldridge to a nearby shooting range for target practice. In early June 1991, defendant purchased an inexpensive .380 semiautomatic handgun to use for target practice. He testified that he purchased the firearm because previously at the practice range he had been forced to rent expensive guns for which ammunition also was quite costly, and he wanted instead to have a simple and serviceable gun that would use less expensive ammunition. After the mandatory 15-day waiting period expired, defendant took possession of the gun on June 18, 1991.

Williams testified that defendant's behavior then changed and that he began to handle and play with the gun and became "obsessed" with it. In addition, Williams testified, defendant "became, quote, unquote, a bigger man, you know, because he had all this protection behind him so now he could walk and talk big." Williams explained that defendant's possession of the gun gave him "an attitude, like he was just invincible" and that "wherever he went the gun went. . . . And you could just tell, you know. When someone changes you can just tell."

Williams also testified that, when defendant still was working at the Subway shop and on numerous occasions well before defendant moved into Williams's apartment in June 1991, defendant mentioned the possibility of robbing the Subway shop because he needed money. Williams related that defendant said the shop would be an easy target "because he . . . knew the place." According to Williams, he told defendant he was crazy and assumed defendant was joking.

These conversations, Williams explained, recurred on numerous occasions after defendant moved into Williams's apartment in June 1991. Williams recounted that defendant told him how he planned to rob the Subway shop and repeated that he would do so because he needed money: "He told me he was going to go in and order some food. After that he was going to hold 'em up, and if, when he went in, . . . they were people that he knew he would have to kill them, shoot them execution style." According to Williams, defendant also spoke specifically of his "need to get his hands on some money," the layout of the shop, the absence of security cameras, the use of

pliers to remove money from the shop's safe, and the relative ease of escaping through the shop's back door.

Williams testified that he went with defendant to the Subway shop on one occasion after defendant had ceased working there and that defendant, after joking with the employees, commented to Williams as they left the shop, "Well, too bad if they are in there. Too bad. I'll have to kill them if they are in there."

Aldridge testified that he was present at Williams's apartment when, approximately one week prior to the commission of the crimes, defendant spoke of his need for money to pay various bills and his plan to commit a robbery at either the Subway shop or a gas station, or perhaps to rob a person walking on the street. According to Aldridge, defendant raised the subject again two days later, also while at Williams's apartment, with Williams and Donna Morgan also present. On that occasion, defendant focused his plan upon the Subway shop at which he had worked. According to Aldridge, defendant asserted that he "knew the hours. He knew the people who worked there. He knew . . . where the safe was and what he decided to do was pick this individual Subway because it was the easiest target for him to rob."

Aldridge recounted a third conversation that occurred at Williams's apartment, in which defendant repeated his plan to rob the Subway shop that weekend and execute the employees who were on duty at that time by "lay[ing] them down and blow[ing] them away at the back of their heads, using his words." Aldridge testified that he and Williams were "pretty much trying to discourage [defendant] from trying to rob somebody. We knew we had no control over [him]. He had just purchased a gun. He was really excited about that. We were more or less trying to save his life and getting him out of a bad situation." Nevertheless, Aldridge testified, defendant stated that although he "felt bad" that he would have to kill people whom he knew, he also repeatedly stated that he needed money and did not "give a damn. They are going to die because I need the money." Aldridge asserted that he declined defendant's request for a ride to the planned robbery because "one, . . . it was a crazy idea, and two, my car was being painted that weekend." Aldridge asserted that neither he nor Williams believed that defendant actually would commit the planned robbery, because defendant "was one for talking and not doing things."

Williams further testified that on Saturday, June 29, 1991, he informed defendant that defendant would have to move out of the apartment because he (defendant) had told Donna Morgan "things that weren't true" (that Williams had been unfaithful to her) and because defendant had caused Williams's telephone to be disconnected due to nonpayment of defendant's

long distance bills. During that conversation Williams left defendant alone in the apartment living room at one point, and thereafter Williams and Donna heard defendant load his gun. Williams testified that Donna mentioned that defendant was loading his gun and that Williams replied to her, "don't worry, he is not a fool."

Williams testified that, after defendant left the apartment, he checked the "gun box" that defendant kept in the living room on the side of the couch and found it empty.[2] Defendant returned to the apartment half an hour later and asked to speak with Williams, who met him outside the front door. Williams testified that defendant was depressed and crying and that he told Williams that he loved Williams like a brother, did not want Williams to be "like him," and wanted Williams to be "better than him." According to Williams, defendant then gave him a note, the general contents of which he could not recall, but the last line of which read, "pray for me."

Because defendant had no other place to go that night, Williams and Donna agreed to let him remain in the apartment until the next morning. Defendant again departed from the apartment at approximately 11:30 p.m. Williams testified that he believed defendant took his gun because he heard defendant handling it only shortly beforehand, and because defendant "always had it."

Rebecca James (James) resided in an apartment next to the Subway shop, which was located approximately five blocks from Williams's apartment. At approximately 1:30 a.m. on Sunday, June 30, as James walked home from a date, she passed the Subway shop. The shop was well lit and she saw three males inside: one White person behind the counter, who appeared to be an employee; one Black person in front of the counter, who appeared to be a customer; and a third person, who was White. James testified that the Black person was holding what she thought or assumed was a metal pan. She thereafter described hearing a loud sound, which she assumed was the metal pan being dropped to the floor. James explained that after she heard the noise, she "immediately saw the customer [the Black person] either run around the counter or jump on the counter and over. I thought maybe he was chasing him." James assumed that the three were simply "roughhousing," proceeded to walk to her own apartment, and saw nothing more.

At approximately 1:45 a.m., another person—David Kallman—approached the shop, noticed "a body with blood around it," and telephoned 911. Police arrived at the scene at approximately 2:00 a.m. and found Brian Berry lying dead in a pool of blood near the counter. A Subway employee, James White,

---

[2] As defense counsel emphasized on cross-examination, this conflicted with Williams's preliminary hearing testimony, in which he twice asserted that he had not checked the gun box.

was found lying facedown in a pool of blood behind the cash register, alive but mortally wounded. Brian Berry had been shot twice, once in the cheek from 12 to 18 inches away and a second time while the gun was in contact with his head, just above the right ear. James White had been shot with a gun that was in contact with the crown of his head when fired. A forensic pathologist testified that the trajectory of the bullet that struck White was consistent with the victim having been shot while kneeling. All three bullets were recovered.

The cash register was empty of all paper currency, and the shop's floor safe was open. Testimony revealed that approximately $580 had been taken from the cash register and the floor safe (including approximately $200 in paper currency and rolled coins that were missing from the safe). Of this sum, between 60 and 75 one dollar bills, some of which had been kept in the safe for making change, were missing.

The cash register's journal tape showed that the last transaction had taken place at 1:32 a.m.—an order for a turkey and bacon sandwich, a seafood sandwich, and two tuna salads. The order had been subtotaled, but the items apparently had not been paid for. Investigators found a plastic Subway bag containing a wrapped turkey and bacon sandwich in an alley outside the shop's back door. The prosecution's fingerprint expert testified that defendant's left index fingerprint and left thumbprint were found on the bottom left-hand corner of the plastic Subway bag. According to that witness, analysis of the position of the two prints—both of which were on the same side of the bag—disclosed that they "could not [have been] placed" on the bag at the same exact time, but must have been placed on the bag at different times. The three bullets recovered from the victims' bodies were examined by an independent firearms expert who testified that, in his opinion, each had been fired from the gun later confiscated from defendant upon his arrest and could not have come from any other weapon. Finally, investigators recovered a shoe print from the top of the Subway shop's counter, but were unable to match that print with the single shoe seized from defendant's residence immediately following his arrest.

Defendant subsequently returned to Williams's apartment, where Williams heard defendant enter at approximately 3:00 or 3:30 a.m. on June 30, 1991. Williams testified that when he awoke in the morning, defendant was gone, but his personal belongings still were there. According to Williams, defendant returned to the apartment later that day and was "very excited, kind of hyper almost" and asked whether Williams had read the newspapers. Williams

responded "no," and defendant told Williams that there had been a robbery at the Subway shop. Williams testified that defendant then gave him $60 in cash for his share of the apartment telephone bill and said that he had made living arrangements in the dorms at CSUN.[3]

Later on Sunday, June 30, Aldridge "saw on the news [that] the specific Subway that [defendant] had planned to rob had been robbed and two people had been murdered, just as [defendant] said he would murder them." Aldridge immediately telephoned Williams, who also had seen the report. Aldridge testified that defendant telephoned him later that evening and was "very hyper. . . . He constantly told me he had a surprise for me. And I asked him specifically if he had done the murders and robbed the Subway. He giggled. He would not tell me no, but he wouldn't tell me yes."

Defendant was scheduled to work in the supermarket meat department on Sunday, June 30, but telephoned to say that he was ill. At approximately 11:00 a.m. that day, defendant rented an apartment from Donna Lopez, producing $400 in cash in $10 and $20 bills. Lopez testified that she advised defendant that she could not accept cash and that she needed to run a credit report. Defendant returned shortly thereafter with a completed application and two money orders for $400 total, plus $25 in $1 bills for the credit check. He moved into the apartment the next day.

James, who had observed the interior of the Subway shop at or around the time of the crime, was contacted by the police on June 30 and described the Black man whom she had seen as being in his early twenties, "approximately 5–11," "not real Black in color," with "big lips" and "short cropped hair, Afro style."

Defendant attended his job at the supermarket on July 2. Ostrander, who also was on duty at that time, testified that he was busy with customers but that defendant at one point grabbed his arm and said "I need to talk to you about something." According to Ostrander, defendant inquired whether Ostrander knew about the Subway killings. Ostrander replied that he was unaware and testified that defendant replied, "well, there was killings at the Subway shop. I popped those two kids." Ostrander testified that he did not believe defendant and that he replied, "Yeah, right." In response, Ostrander asserted, defendant showed him a small handgun that defendant kept in his right sock.

According to Ostrander, defendant told him that he had been wrongly accused of stealing money from the Subway shop and had been upset about

---

[3] On cross-examination, Williams acknowledged that previously, at the preliminary hearing, he had testified that defendant had paid the $60 "a couple of days before he moved out" of the apartment.

that false charge. Ostrander recounted that defendant said he had been in the shop's parking lot for an hour with a friend, planning the robbery. And then, Ostrander asserted, defendant "told me how he did everything."

"He said he went into the shop to make it look like he was purchasing a sandwich . . . and looked around. . . . He said he noticed that there was somebody sitting at a booth, a young kid. . . . And . . . the kid made a remark to him, 'hey, don't I know you from somewheres?' [¶] And [defendant] told me he said back to the kid, 'no, I don't know you. . . .' [¶] And the kid said, 'oh no, I do. I know you from somewheres.' [¶] [Defendant] told me that he . . . knew he had to pop that kid because . . . he knew that kid would remember him.[4] [¶] And at that time he pulled the gun out and made both of them go around the back of the counter because he said he knew the safe was in the floor. And also, he wanted to keep the guy away . . . from the cash register . . . because he knew there was a buzzer . . . that was supposed to be there. [¶] And when he walked him up to the safe, he made the guy unlock the safe. And as soon as he unlocked the safe he said the guy that was unlocking the safe that was working there, he had his back to [defendant], and [he] shot him in the back of the head. And at that time he said the kid turned around and the guy just looked at him, and he shot him again."

Ostrander continued: "He said that . . . he was pissed about [the gun] because he said it didn't have enough, excuse my language, 'fucking killing power.' [¶] And at that time he said the one that opened the safe . . . went down on the ground. And then the other kid in the shop started to run. And . . . [defendant] caught him on the left side of the temple of the head and shot him in the side of the head, and he fell down on the opposite side of the counter. [¶] And he said that . . . he went over to the other kid and put the gun up to his head and the kid, he said he was laying in a puddle of blood crying and screaming, and he pulled the trigger and it went 'click, click,' and he said the gun ran out of 'fucking bullets.' [¶] And then he had a brown bag with him that he carried . . . so he could pick . . . up [the cartridges] so nobody could trace it. And he forgot to do that when he first fired the gun . . . [a]nd . . . couldn't find all the bullets. . . . [¶] He said when he ran out of the shop, the kid on the outside of the counter that was laying in the blood . . . was still screaming and stuff like that, and he ran out of bullets. And at that time he said he knew the kid was living, and he just ran out of the shop."

Ostrander added that defendant told him that the Subway employee who had opened the safe was one of the persons who had told Subway management that defendant earlier had stolen money from the shop and that

---

[4] Defendant apparently was referring to Brian Berry, who was in the Subway shop visiting his friend James White. Berry previously had worked at one of the supermarkets where defendant had been employed and apparently recognized defendant from that experience.

defendant "had a grievance against him, and that both victims had pleaded, '[p]lease don't shoot me. Don't shoot me.' " Ostrander further testified that defendant told him that he took "a little less than 500 bucks"—and that when defendant told him "all of this," he "absolutely [did] not" believe defendant, because he did not seem to be the type of person who would commit such acts.

Aldridge recounted that he had additional telephone conversations with defendant on July 1 and 2 and that, during the latter conversation, defendant directed Aldridge to go to an abandoned gas station and telephone him at a specific number from a phone booth there. Aldridge, accompanied by his friends Raquel Rose and Wendell Jones, drove to that location as directed and, while standing at the phone booth, Aldridge heard defendant call him from across the street. Aldridge testified that he reentered his car, drove across the street, and picked up defendant, who directed that Aldridge drive circuitously to defendant's apartment. Aldridge testified that defendant, contrary to his normal character, was extremely nervous and patted him down "to see if I had a gun."

Aldridge testified that defendant was carrying his gun without its clip but with a bullet in the chamber and that once they were inside defendant's apartment, Aldridge insisted that defendant place his gun on a shelf where all could see it. Thereafter, Aldridge recalled, he and defendant walked outside alone and Aldridge asked defendant whether he had committed the murders. Defendant responded again in a giggling manner and, smiling broadly, said "yeah, I blew them away." Aldridge explained, "he knew what the subject would be about, and after I asked him, he just let loose. It was a big laugh and a big yes." Aldridge recounted: "He . . . told me [that] . . . to avoid being id'd, he felt bad about it, but he had to blow them away, and he described [how] he shot one of them behind the head and another one on the side of the head and he wasn't sure if he was dead yet, so he shot the other guy behind the head again." According to Aldridge, defendant committed the crimes because "he needed the money." Defendant told Aldridge that he had gathered approximately $600 or $700 in the robbery. Defendant treated the group to food and drinks, and they spent the night together at his apartment.

After Aldridge drove defendant to his supermarket job the following morning, Aldridge telephoned Williams. Aldridge testified that he did not want to turn defendant in, but believed that Williams would take that step.[5]

---

[5] In his opening brief, defendant repeatedly emphasizes that, at one point during Aldridge's testimony, Aldridge stated that he had not wanted "to turn *Tai* in." (Italics added.) Defendant asserts that Aldridge "*later* corrected himself, stating that he had meant to say 'James' [that is, defendant]." (Italics added.) In fact, as the record discloses, the witness *immediately* corrected himself, saying, "I mean, excuse me, turn James [defendant] in."

Williams and Donna Morgan did so, and Aldridge eventually also contacted the police and cooperated with them.

The witness who lived near the Subway shop, James, learned that a reward was being offered in connection with the crime investigation, and her family arranged for her to meet with a private attorney in connection with any possible reward. On July 9, 1991, James helped the police produce a composite drawing of the Black man she had seen inside the Subway shop and later testified that the completed sketch looked "something like" the man she had seen.

The sketch showed a man without eyeglasses. Various witnesses testified that defendant usually wore glasses but sometimes did not.

Although James had been unable to identify defendant from a photographic lineup shown to her a few days after the crimes, at the trial nearly two years later, James was "absolutely positive" that defendant was the man she had seen in the Subway shop. Nevertheless, James acknowledged, there were dissimilarities between defendant and the man she recalled having seen and described to the police: James did not recall the man's wearing eyeglasses, and she recalled the man as having a rounder build and face than defendant's as he appeared at trial.[6]

Ostrander further testified that, despite having been told by his own girlfriend about the Subway crimes, he still had not believed defendant's story, and for that reason did not disclose to the police, until after defendant had been arrested, the admission that defendant had made to him. Ostrander explained that defendant previously had made up various stories "to impress me or whatever," but that he had begun to believe defendant's story when, upon departing at the end of one of his shifts, he was met in the parking lot by a pair of Black men who told him to "keep [his] fucking mouth shut." Thereafter, according to Ostrander, the two men, both wearing sunglasses, met him as he arrived for work and stared at him for approximately 30 seconds. At that point, Ostrander stated, he "knew [he] had a problem," went inside the market, called a meeting of his supervisors, and told them "what's going on." Ostrander testified that he subsequently received numerous threatening telephone calls at his workplace and that his employer moved him to three different stores during a six-month period in response to those threats. Ostrander also testified that, after he attended the preliminary hearing in this

---

[6] Various other witnesses commented that at the time of trial, defendant appeared slimmer than he had earlier.

case, his supervisor told him not to go to work that day, because other supermarket employees had reported that two men with sunglasses had been waiting for him at the meat department for about 20 minutes. Ostrander explained that he was kept off the work schedule for a few days thereafter. Finally, Ostrander testified that once, while driving to discuss these matters with a supermarket supervisor, he was run off the road, but was told by supermarket management that it was unnecessary to file a police report concerning that incident and that the supermarket would protect him by moving his work location from one store to another. Ostrander conceded that, because of these experiences, he feared for his own safety and once had told police officers that if the case against defendant "goes to trial I am not going to remember anything."

On cross-examination, defense counsel confronted Ostrander with a prior statement Ostrander had made to the police, in which he had said: "I just want to be truthful. I will go to the court for you, but that's my terms and I want to do it. And if I have to ask the police department to help me out with [my employer] with a lawyer stating, okay, this man, we are going to need him. This is the terms. You are going to give him a settlement and it is not going to be no $50,000 or something because he cannot live. I want to get something going for myself." Ostrander explained his comments as reflecting his frustration that, because he had reluctantly become a witness in this case, he had "lost" his 11-year career at the supermarket and had sought a settlement from the market so that he could relocate. When asked by defense counsel whether the above-quoted statement "represent[s] your feelings on the subject?" Ostrander responded: "My feelings is I feared for my life and wanted to move away."

Nine days after the crimes were committed, defendant was arrested on the street, in front of his apartment. He was not wearing eyeglasses. He waived his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) and agreed to speak with the police. The police report's summary of that interview reads as follows: "[Defendant] denied both the murders of James White and Brian Berry, and the robbery of the Subway sandwich shop. [Defendant] claimed that on the date of the crime, 6-30-91, he was visiting a CSUN student, Etsuko Sugita. He was visiting with her until about 0140/0145 hours. [Defendant] said that he did not have his gun with him because when he left the apartment earlier in the evening he could not find it. [Defendant's] statements to the detectives included 'I always carry the gun with me. I carried it all the time until this happened.' " A transcript of the tape-recorded interview was prepared.

## 2. *The defense case*

Defendant testified on his own behalf. He denied committing the robbery or the murders, denied having the various conversations recounted by Williams, Aldridge, and Ostrander, and denied much of the testimony by other witnesses. He testified he was frightened when he spoke to the police, and assumed he had been arrested because he is Black and formerly had worked at the Subway shop. Defendant further explained that he was nervous and embarrassed during the interview because he knew who had committed the crimes, but thought that the police would not believe his story about being at the scene and for that reason did not tell the full truth at that time. He also testified that he began wearing eyeglasses in third grade and cannot see clearly without them.

Defendant asserted that Williams had made various comments about robbing the Subway shop. Specifically, defendant testified that Williams had picked him up at least once from his shift at the shop and had remarked that the enterprise did not appear to be making money. Defendant testified that, in response, he showed Williams hourly logs reporting the sums that had been collected. Defendant further testified that, in early June 1991 (while defendant was living at Williams's apartment), Williams raised the idea of robbing the Subway shop after Williams and Donna Morgan watched a crime program on television. As defendant described it, Williams was sitting on the living room floor, holding his baby, and commented, "Hey, if you rob the Subway, you can go out the back door, can't you?" Defendant testified he replied by observing that such a plan would not work, because a certain gate was kept locked. Defendant added that Williams again brought up the subject approximately one week prior to the commission of the crimes, when he and defendant were at the target practice range. At that point, according to defendant, Williams asked him, "if you shoot people in the Subway, can't you kill them in the refrigerator?" Defendant recounted that he responded, "if you shoot anybody in a place like that, you'll lose your hearing." Defendant testified that he began to believe that Williams "was a little bit overboard with this," but that defendant "did not worry about it."

Defendant testified that when he lived with Williams and Donna Morgan, they bickered constantly, were unfaithful to each other, and called upon him to help settle disputes that arose between them. Defendant also asserted that when he left Williams's apartment on the evening prior to the Subway crimes, he placed three $20 bills on a counter in the living room to cover his share of the telephone bill. He further testified that when he returned to the apartment shortly thereafter to speak with Williams, he assured Williams that

he was not trying to interfere with Williams's relationship with Donna and told Williams that he (Williams) would be a "better man" if he took defendant's advice and applied for a job at a supermarket, which in turn would provide benefits for Williams's child. Defendant also recounted that he told Williams not to worry about him and that he understood that Williams had to "do what you have to do." Defendant denied Williams's testimony that he gave Williams a note. Defendant asserted that he asked, "what's going on?," and that Williams responded, "meet me at the Subway at one o'clock."

Defendant testified that, after he left Williams's apartment, he walked to a Kentucky Fried Chicken restaurant where he kept his bicycle locked and rode it to the supermarket to speak with an acquaintance who previously had offered to share an apartment with him, in order to make arrangements for new housing. The acquaintance was not at work. Defendant testified that he then went to the CSUN dorms to visit a Japanese student named Etsuko, whom he had met earlier that evening, and made plans to meet her at her dorm at midnight. Defendant testified that he left Etsuko's dorm after 1:00 a.m. and did not care that he was late for his appointment with Williams at the Subway shop at 1:00, because he had since come to the conclusion that he "did not want to hear anything that [Williams] had to say" to him. Nevertheless, defendant testified, he decided to walk the half- or quarter-mile to the Subway shop, because he thought Williams would be upset with him for failing to arrive as planned at 1:00 and defendant wanted to be able to later tell Williams that he indeed had been there after the meeting time and simply had tired of waiting for him. Defendant further explained that he planned to be able to describe to Williams the employees who had been working that shift, in order to prove to Williams that he had been at the shop after 1:00 a.m.

Defendant testified that as he entered the shop he noticed a person with a bloody face sitting on the floor facing the counter—a position that, defendant conceded on direct examination, was different from that shown in the crime scene photos. Thereafter, defendant claimed, he heard the two-by-four board that was used to bolt the shop's back door drop to the ground, and he then heard the distinct sound of two sets of footsteps in the back of the shop. Defendant described one set of the footsteps as sounding "like tennis shoes" and making a "chirping" noise and the other set as sounding "like a different shoe, a heavier shoe."

Defendant asserted he walked toward the back of the shop, jumped over another person lying on the ground behind the cash register, looked around a corner, and saw the back door closing slowly, as if under its own motion.

Defendant testified he ran out the back door, saw a departing 1990 Mustang, and chased after it. According to defendant, the car's brake lights illuminated, revealing white light emitted from broken plastic panels on each side. Defendant asserted he realized at that point that the car was Williams's (who drove a gray 1990 Mustang with broken tail lights). Defendant explained he "immediately thought that I should take something and let him know that I know what he did." According to defendant, "when I looked down I saw the [Subway sandwich] bag. I went to reach for it and then something told me don't touch anything so I didn't, and then I ran." Later in his testimony, defendant explained: "When I looked down I saw the bag and the logo, and I could see the asphalt up under it so there was nothing in the bag. And I had went to pick it up, and then I just thought don't touch it. And there was nothing in the bag that I can remember seeing. I saw clear through the bag to the asphalt. It was dark beneath." Asked if he recalled "actually touching the bag itself," defendant responded: "In a way I do, but I don't think that I had—I don't believe that I had actually lifted it. I had never completed a stand from off the ground where I had bent over to touch it. Right then I let go before I began to lift up." Defendant twice demonstrated for the jury how he had bent down and touched the bag by pinching it between his left forefinger and thumb, and he reiterated that the bag he had touched had been empty.

Thereafter, according to defendant, he ran down the alley and "thought about going down to the police station but didn't know if that was the right thing to do. Because I knew who did it personally. [¶] I began to think . . . [w]hen I was crossing the street . . . 'why did he ask me to meet him there.' And then I begin to wonder if he was going to kill me because he was acting like he was mad at me that night I left. So I didn't know what to do."

Defendant testified that, when he arrived back at Williams's apartment in the early hours of Sunday, June 30, he "tried not to go to sleep so that I wouldn't get confronted" by Williams or be "caught off guard" by him. On cross-examination, defendant acknowledged he was armed with his own gun at that time.

Defendant further testified he left the apartment at 6:00 on Sunday morning, June 30, checked into a nearby hotel, and then departed to look for an apartment to rent. Defendant stated that Aldridge had paged him numerous times at work following the Subway crimes and that he finally telephoned Aldridge because the constant pages were annoying. Defendant asserted he agreed to let Aldridge come to see his new apartment so that he (defendant) "would be able to know whether Tai had intended to do what he did . . . ."

On cross-examination, the prosecutor quoted extensively from the transcript of defendant's postarrest interview, which revealed that defendant

repeatedly and emotionally had denied being at the Subway shop on the morning when the crimes were committed. The prosecutor exposed and highlighted scores of inconsistencies in defendant's testimony[7] and ultimately asked defendant why the jury should believe his story and disbelieve the numerous witnesses who had testified contrary to his version of the events. Defendant responded that nearly everyone else who had been called by the prosecution to testify at his trial had lied—some witnesses, about "a lot of things"; others, about "a few things"—and that he had "tried" to tell "nothing but the truth."

Los Angeles Police Officer Peggy Moseley, one of the investigating officers in the matter, was called to testify by defendant and recounted that eyewitness James had been unable to identify defendant in a photographic lineup conducted three days after the Subway crimes.[8]

## B. *Penalty Phase Evidence*

After finding defendant guilty of the charged offenses and making true findings on the two special circumstance allegations, the jury heard penalty phase evidence and ultimately deadlocked seven to five in favor of imposing a sentence of death. The court declared a mistrial as to penalty, after which defendant's trial counsel (Bruce Hill) was relieved due to a conflict[9] and

---

[7] For example, the following exchange occurred concerning statements made by defendant at the time of his arrest:

"Q. . . . Did you tell Detective Richardson 'Do I seem like I am lying? Do I look like it?' Did you say that?

"A. Yes, sir.

"Q. At that time you were crying about all this too at the same time, weren't you?

"A. Yes, sir.

"Q. At that time you were lying through you teeth, weren't you?

"A. Yes, sir."

[8] Defendant argues in his reply brief that respondent fails to present an accurate picture of the guilt phase facts, because respondent's recitation highlights evidence tending to show that defendant was in financial difficulty in the months prior to the robbery and the homicides. Defendant's criticisms lack merit. Indeed, defendant's own accounting of the guilt phase facts is itself improper: in both his opening brief and reply brief, defendant repeatedly augments his description of the facts with numerous citations to the record of the penalty phase retrial—testimony that was not before the jury that heard and tried the guilt phase issues.

[9] The nature of the conflict was as follows: In early June 1993, Hill had commenced representing another inmate, Anders. Subsequently, Anders informed Hill that, in May 1993, while defendant was awaiting the jury's verdict in the first penalty trial, defendant confessed to Anders that he had killed the two victims and Anders had so informed the prosecution. Numerous proceedings ensued, during which it became clear that, among other things, the prosecution might call Anders as a witness at defendant's penalty phase retrial. Hill eventually moved to be relieved in both matters. Upon granting Hill's motion in the present case, the trial court commented that it did so "[w]ith great reluctance. He has served the defendant well. [¶] I stated many times that in my experience in almost ten death penalty cases I have both

replacement counsel (Richard Leonard) was appointed to represent defendant. Nine months later, the court empanelled a new jury and the prosecution presented, in essence, the evidence set forth *ante*, detailing the circumstances of the crime: defendant had financial problems in the months prior to June 1991 and was living with friends because he could not afford an apartment of his own; he purchased a handgun in early June 1991 and spoke repeatedly of robbing the Subway shop; on June 29, 1991, defendant robbed the Subway shop and fatally shot each of the two victims in the head; and defendant thereafter admitted doing so to his friend Aldridge and his coworker Ostrander. (Aldridge testified on direct examination that both he and Williams had received $7,000 in reward money that had been offered in connection with the Subway crimes.) Finally, as explained *post* (pt. II.C.4.), the victims' relatives testified concerning the devastating impact of the killings on their own lives.

Defendant again testified on his own behalf, essentially repeating his testimony at the guilt phase of the trial. In addition, defendant described his childhood and his brief service in the United States Marine Corps. He explained that he had dropped out of college because he had misspent financial aid money that had been granted to pay for his housing expenses, and that he also had written a few bad checks in May and June of 1991, but asserted the bank erroneously had failed to honor some of his checks. Defendant denied robbing the Subway shop or killing the two victims and asserted that Tai Williams was the true perpetrator of the crimes. Defendant explained that he previously had lied to the police and had not implicated Williams, because defendant did not trust the police and was frightened. Defendant repeatedly stated that he now was telling the truth and that the various prosecution witnesses who testified otherwise were lying.

Thirteen witnesses testified extensively on defendant's behalf. Some explained that they had met defendant as a child when his mother had joined a church choir group and that they found him to be nice, quiet, nonviolent, responsible, and mild-mannered. Others—such as former neighbors at college—gave similar testimony.

Defendant's mother testified that she was strict when raising defendant and his sisters and that she remained protective of defendant when he was in college, sometimes visiting him two or three times a week and supplying him with money and groceries. She also explained that after defendant misspent the financial aid money that had been intended for his housing expenses, she met with defendant and school officials and arranged to repay the school

---

participated in as a lawyer and presided over as a judge, Mr. Hill's performance was by far the best."

more than half of the funds, with the understanding that defendant would repay the balance. Defendant's mother characterized him as meek, mild, and soft-hearted, and testified that when he telephoned her in mid-June to tell her that he was staying with Williams, she became angry and told him to return home, but he refused.

Defense counsel also introduced six photographs of defendant, depicting him (a) during a family vacation cruise celebrating his 16th birthday, (b) during a visit to Hearst Castle in San Simeon, (c) in second grade "when he first got his glasses," (d) at an Order of the Eastern Star banquet that defendant attended with his mother and sisters as a Junior Mason, (e) in a helicopter, along with his sisters, at a Young Marine Corps camp, and, finally, (f) graduating from high school.

In rebuttal, the prosecution presented the testimony of the detective who had interviewed defendant on the day of his arrest. The officer recounted that defendant repeatedly and forcefully had denied being present at the Subway shop on the night of the crimes.

## II.  DISCUSSION

### A.  *Asserted Errors During Selection of the First Jury*

The court prepared, and prospective jurors completed, a detailed juror questionnaire. Defendant challenges the use and administration of the questionnaire and the resulting jury selection process in this case. Indeed, in the course of his combined 210 pages of briefing on this subject, he argues that this case "presents virtually every imaginable form of error which can possibly occur in voir dire and jury selection." We address immediately *post* the challenges that affect the first trial. We shall consider in a subsequent section (pt. II.B.1.) defendant's additional voir dire challenges relating specifically to the penalty phase retrial.

### 1.  *Claims concerning Code of Civil Procedure section 223*

■    At the time of the first and second trials in this matter, Code of Civil Procedure section 223 provided that, in a criminal case, the court "shall conduct the examination of prospective jurors," but that the parties "upon a showing of good cause" may "supplement the examination." (As added by § 7 of Prop. 115, approved by electorate eff. June 6, 1990; see generally *People v. Taylor* (1992) 5 Cal.App.4th 1299, 1307–1309 [7 Cal.Rptr.2d 676] (*Taylor*) [describing the history of the statute].)[10] By contrast, in *civil* cases,

---

[10] "As amended effective in 2001, this statute now confers upon counsel for the parties a limited *right* to examine prospective jurors, following the court's initial examination."

at the time of the trials in this case (as now), Code of Civil Procedure section 222.5 generally conferred a *right* of attorney voir dire.

Defendant contends that the restrictions imposed by Code of Civil Procedure section 223 upon voir dire in criminal cases violated his equal protection rights under the state and federal Constitutions. We reject that claim for the same reasons that we recently set forth in *People v. Ramos* (2004) 34 Cal.4th 494 [21 Cal.Rptr.3d 575, 101 P.3d 478]: "The right to voir dire the jury is not constitutional, but is a means to achieve the end of an impartial jury. (*People v. Estorga* (1928) 206 Cal. 81, 84 [273 P. 575].) . . . . '[T]here is no constitutional right to any particular manner of conducting the voir dire and selecting a jury so long as such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries are not transgressed.' (*People v. Boulerice* (1992) 5 Cal.App.4th 463, 474 [7 Cal.Rptr.2d 279] (*Boulerice*).) [¶] Federal and state courts have held, however, that the Legislature may establish reasonable regulations or conditions on the right to a jury trial as long as the essential elements of a jury trial are preserved, including number of jurors (12), unanimity, and impartiality. (*Boulerice, supra,* 5 Cal.App.4th at p. 474.) The purpose of Code of Civil Procedure former section 223 was to curb commonly known abuses during the voir dire process in criminal cases. (*Boulerice, supra,* 5 Cal.App.4th at p. 474.) [¶] As the People observe, therefore, the statute's distinction between criminal and civil voir dire is constitutional as long as it is rationally related to a legitimate state purpose under the rational relationship test, a test met here. (*People v. Leung* (1992) 5 Cal.App.4th 482, 496 [7 Cal.Rptr.2d 290].) By enacting Code of Civil Procedure section 223, the voters sought to prevent abuse of the jury selection process in criminal cases. Prevention of abuse of a statutory right is a legitimate purpose, and the voters' action was aimed at achieving a legitimate purpose rationally related to the distinction made by the law. (*Leung, supra,* 5 Cal.App.4th at p. 496.) Because the classification drawn by Code of Civil Procedure section 223 was rationally related to a legitimate state purpose, it did not deny defendant his equal protection rights under the California and United States Constitutions. (*Leung, supra,* 5 Cal.App.4th at p. 496.) " (*Ramos, supra,* 34 Cal.4th 494, 512–513.)

Defendant also argues that reversal is required because the trial court did not understand the extent of its discretion under Code of Civil Procedure section 223. We reject defendant's claim.

---

(*People v. Stewart* (2004) 33 Cal.4th 425, 455, fn. 18 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*); see Stats. 2000, ch. 192, § 1.)

Defense counsel moved unsuccessfully under that statute for both attorney-conducted voir dire and individual sequestered voir dire concerning the issue of death qualification. At the hearing on that motion, the trial court discussed a number of cases cited by defense counsel, including *Taylor, supra,* 5 Cal.App.4th 1299. Defendant focuses upon one sentence of the court's description of *Taylor,* in which the court asserted, "A trial court is not allowed to ask open-ended questions but may ask those questions that could call for a yes or no answer." We agree that the trial court's characterization of *Taylor* was inapt—that case held only that open-ended questions were not constitutionally compelled *in that case* (see *id.,* at pp. 1315–1316). But the record in the present matter discloses that the court's extensive 20-page juror questionnaire (which was, of course, part of the voir dire process itself) contained numerous open-ended questions (such as "what, if anything, have you already learned about this case or about the defendant?"). Moreover, during the court's own voir dire examination of the prospective jurors, it did occasionally ask open-ended questions (inquiring, for example, "what are those situations?" in response to a prospective juror's assertion that he could vote for the death penalty in some situations). In any event, the record demonstrates the trial court's general awareness—*at both* the first trial and the penalty phase retrial—that it possessed discretion to conduct oral voir dire as necessary and to allow attorney participation and questioning as appropriate. For example, at the start of the first trial, the court specifically advised the parties that it did not preclude "any consideration of additional questions on a juror by juror basis, and I will consider each request individually as they come up." Moreover, as further explained immediately *post*, defendant has not shown that the voir dire examination conducted by the trial court in this matter was inadequate.

### 2. *Claims of error concerning the jury selection process*

Defendant claims that the trial court's voir dire examination was insufficiently comprehensive, thereby impairing both defense counsel's ability to make challenges for cause and the trial court's ability to rule properly on those challenges, and that "there is no guarantee that the jurors selected in either phase of the capital trial were fair and impartial." As noted *ante*, the trial court required all prospective jurors to complete a 20-page juror questionnaire that asked 56 questions, many with subparts, calling for more than 90 total responses. Although the court offered counsel the opportunity to suggest modifications to the questionnaire, the record does not reflect that either party did so.

The resulting questionnaire required the prospective jurors to provide answers to a broad range of questions. Each juror was directed to state his or her name, age, sex, area of residence, occupation and employer, total family

income, former occupations, and prior places of employment, as well as whether he or she had served in the Armed Forces, and if so, whether he or she had any involvement with the military police or military justice system. The questionnaire inquired as to each prospective juror's marital status, as well as the names, ages, occupations, and employers of spouses and children. It also probed each prospective juror's level of education, as well as any legal or medical training.

Some questions required only "yes" or "no" answers or other similarly brief responses. Many urged the prospective juror to explain his or her answer to open-ended questions such as inquiries regarding any experience visiting an incarcerated friend or family member, any association with attorneys, law enforcement officials, psychologists, or psychiatrists, and any prior jury service. Each prospective juror was asked whether he or she (or a close friend or relative) had been involved in any criminal incident. Other questions probed each prospective juror's ownership or use of weapons, participation in neighborhood crime prevention groups, and pressing business or personal matters or health problems that could affect the prospective juror's ability to sit through a lengthy trial.

The questionnaire further explored whether each prospective juror would have difficulty following the law as given by the trial court, even if he or she disagreed with the law. Each was asked whether he or she had "any feelings against the defendant solely because the defendant is charged with this particular offense . . ." and whether the "mere fact that criminal charges had been filed against the defendant" caused the prospective juror to conclude that the defendant is "more likely to be guilty than not guilty."

Each prospective juror was asked whether he or she knew "anything about this case other than what you have heard in open court," or was acquainted with defendant or the attorneys. Followup questions inquired: "What, if anything, have you already learned about this case or about the defendant? Where did you learn this? Did this information make you favor the prosecution or the defense?" Additional questions inquired about newspapers or periodicals frequently read, radio and television news broadcasts frequently heard or watched, the most recent book read, specific news stories or topics followed by each prospective juror, and participation in civic, social, religious, or volunteer work or organizations.

The questionnaire probed, in open-ended questions, each prospective juror's willingness to "stay as long as is necessary to reach a verdict" and to keep an open mind until all the evidence was presented and arguments were

heard. Each prospective juror was told that parties, attorneys, or witnesses "may come from a particular national, racial, or religious group" or have "lifestyles different from your own," and each was asked, "Would that fact affect your judgment or the weight and credibility you would give his or her testimony?" Each also was asked: "Do you know of any reason why you would not be a completely fair and impartial juror in this case regardless of whether the victim was male or female, an adult or child, related to the defendant, or a stranger, etc.?"

Finally, a separate five and one-half page section of the questionnaire probed each prospective juror's attitude concerning the death penalty.[11]

The trial court conducted further voir dire examination of each prospective juror, first asking whether he or she wished to change any response set forth in the written questionnaire, then additionally questioning each person who failed to respond to any written inquiry or who gave ambiguous, conflicting, or otherwise problematic answers to those inquiries. Finally, the trial court asked each prospective juror a series of four questions concerning his or her attitude regarding the death penalty.[12]

### a. *General challenges to the voir dire process*

Defendant claims the voir dire examination was inadequate because (1) the questionnaire itself was unduly lengthy and complex; (2) the questionnaire was "poorly administered," in that prospective jurors were pressured to complete the forms quickly, with many spending less than an hour doing so, and some of the completed forms contained inaccuracies; (3) the trial court

---

[11] The questionnaire employed at the penalty phase retrial was essentially identical—it was modified only by eliminating questions related to determination of defendant's guilt and the existence of the special circumstances.

[12] Defendant erroneously asserts that "[o]f the 18 jurors actually selected to hear the case, 16 had undergone absolutely no questioning in court . . . ." The four questions asked of *all* prospective jurors in open court were:

(1) "Do you have such conscientious objections to the death penalty that, regardless of the evidence in this case, you would refuse to vote for murder in the first degree merely to avoid the death penalty issue?"

(2) "Do you have such conscientious objections to the death penalty that, regardless of the evidence in this case, you would automatically vote for a verdict of not true as to any special circumstance alleged merely to avoid the death penalty issue?"

(3) "Do you have such conscientious objections to the death penalty that, should we get to the penalty phase of this trial, and regardless of what the evidence is in this case you would automatically vote for a verdict of life imprisonment without the possibility of parole and never vote for the death penalty?"

(4) "Do you have such conscientious opinions regarding the death penalty that, should we get to the penalty phase of this trial, and regardless of what the evidence is, you would always vote for death and never vote for life imprisonment without the possibility of parole?"

displayed a "cavalier attitude" when it conducted only "rushed" and "superficial" followup questioning that did not clarify confusion experienced by some prospective jurors; (4) the court improperly conveyed, through the style and tenor of its questioning, that "the important thing was for the jurors to provide the 'correct' answer" and did not "approach voir dire with an interest in discovering information about [the] prospective jurors' real views and attitudes," but instead was "solely interested in impaneling a jury as quickly as possible"; (5) the court's voir dire exhibited a pro-prosecution and pro-death-penalty bias; and (6) the court's voir dire examination did not provide sufficient information with which to determine the parties' challenges for cause.

Because defendant failed to object or suggest modifications to the questionnaire, he has forfeited any challenge to its length and asserted complexity or to any other aspect of its contents. (*People v. Avena* (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000] (*Avena*).) In any event, on the merits, no basis for reversal appears.

■ It is established that a trial court "is in the best position to assess the amount of voir dire required to ferret out latent prejudice, and to judge the responses" (*Taylor, supra,* 5 Cal.App.4th 1299, 1314), and hence a trial court has " 'great latitude in deciding what questions should be asked on voir dire.' " (*People v. Earp* (1999) 20 Cal.4th 826, 852 [85 Cal.Rptr.2d 857, 978 P.2d 15], quoting *Mu'Min v. Virginia* (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 111 S.Ct. 1899] (*Mu'Min*).) In the present case, "[v]iewing the voir dire record as a whole, we cannot say that the voir dire was inadequate and that the resulting trial was fundamentally unfair." (*Stewart, supra,* 33 Cal.4th 425, 458.)

Defendant observes that the trial judge distributed the questionnaires to prospective jurors midmorning and repeatedly admonished that they be returned to the court "by noon today, no later than 1:30 . . . this afternoon." The trial judge also informed the prospective jurors that the courtroom would be closed between noon and 1:30 p.m. and that, if the form could not be returned by noon, they would need to wait to do so until the court reconvened at 1:30 p.m. According to defense counsel at trial, most jurors took approximately 45 minutes to complete their forms, which, defendant calculates, averages approximately 28 seconds per response. From this, defendant argues, prospective jurors must have been pressured into completing the forms

quickly and, he theorizes, inaccurately. In support, defendant observes that a few prospective jurors left some questions blank, thereby demonstrating that they were rushed or confused.

As the trial court observed, however, many of the questionnaire inquiries could be answered quickly with a few words, and most of the forms were fully completed, many with thoughtful written answers to the various open-ended questions. Questions that any prospective juror did not respond to were in turn repeated by the judge during the in-court voir dire examination of that prospective juror and, in some instances, the exchange disclosed that the prospective juror had not been confused, but simply had left items blank in lieu of responding "no" or "inapplicable." Prospective jurors who gave inconsistent or ambiguous answers were asked followup questions by the trial court and, in each instance, the confusion was dispelled and an answer given. Defendant fails to identify any prospective juror who indicated to the court any difficulty in completing the questionnaire in the time provided.

Nor do we believe that the record supports defendant's claim that the court's voir dire examination of the prospective jurors was unduly rapid or otherwise improper. The record shows instead that the trial court was merely efficient—the process was completed in approximately three hours and 20 minutes, resulting in an average examination of approximately three minutes per prospective juror. Nor does the record support defendant's general assertion that the trial court exhibited a pro-prosecution bias or that it pressured prospective jurors to give appropriate answers. For example, one prospective juror had indicated in her questionnaire that she believed defendant "more likely to be guilty" because an information had been filed against him. The trial court explained the presumption of innocence to the prospective juror and asked whether she still believed that defendant was likely guilty. When she replied, "probably not," the court explained that " 'probably' is not good enough." The prospective juror then changed her answer to "no," prompting the trial court to state: "When I say it is not good enough, I don't want you to change your answer just to please me. Don't worry about me. I like all of you. I don't care how you think. Do you understand this is very, very important?" The juror conceded that she still believed a criminal defendant more likely to be guilty and the parties stipulated to her excusal for cause. In dismissing the juror, the trial court stated, "I want to thank you for your honesty."

We conclude that the questionnaire described *ante* and used in this case adequately probed the prospective jurors' backgrounds and views in numerous relevant areas and, together with the trial judge's followup questions, provided an adequate basis upon which the parties were able to exercise challenges for cause as well as peremptory challenges. (See *Boulerice, supra,*

5 Cal.App.4th 463, 477 ["If there is sufficient questioning to produce some basis for a reasonably knowledgeable exercise of the right of challenge, voir dire by the trial judge alone does not deprive a defendant of the right to adequate voir dire under the Sixth and Fourteenth Amendments"].) Moreover, as noted *ante*, consistent with Code of Civil Procedure, section 223, the trial court in this case informed counsel that it would consider "request[s]" for "additional questions on a juror by juror basis . . . individually as they come up," but defense counsel did not act on that offer, apparently because he did not believe any such additional questions were necessary in order for him to exercise his peremptory and for-cause challenges.[13] Defense counsel employed only 14 of his 20 available peremptory challenges, and evidently was content with the jurors selected. " 'The failure to exhaust peremptories is a strong indication "that the jurors were fair, and that the defense itself so concluded." ' " (*People v. Dennis* (1998) 17 Cal.4th 468, 524 [71 Cal.Rptr.2d 680, 950 P.2d 1035] (*Dennis*).) Indeed, in view of the circumstance that the first trial eventually deadlocked seven to five on the issue of penalty, there appears to be no reason to question defense counsel's apparent conclusion that the jurors would be fair to defendant.

> b. *Challenge to examination for potential racial bias and the possible adverse effect of pretrial publicity*

Defendant claims that, in light of the circumstance that he is a Black man charged with murdering two young White men in the early 1990's (which was, defendant asserts, a time of heightened racial tension in the Los Angeles area), the voir dire process inadequately probed prospective jurors' potential racial biases and the possible effect of pretrial publicity. We disagree.

As noted *ante*, the questionnaire employed at the first trial specifically informed the prospective jurors that a party or witness "may come from a different nationality, racial or religious group," and it asked: "Would that fact affect your judgment or the weight and credibility you would give to his or her testimony?"[14] One prospective juror responded in writing, "I might—I try

---

[13] In this and other respects, the present case is distinguishable from *Stewart, supra,* 33 Cal.4th 425, in which a trial court, over defense counsel's objection, erroneously granted the prosecution's challenge for cause based solely upon problematically-phrased jury questionnaire responses and without conducting an in-court voir dire examination of the excused panelists.

[14] As presented in the questionnaire, the question read in full: "*A part(ies), attorney(s) or witness(es)* may come from a particular national, racial or religious group or has a life style different from your own. Would that fact affect your judgment or the weight and credibility you would give to his or her testimony?" (Italics added.) As defense counsel observed at oral argument, in *People v. Roldan* (2005) 35 Cal.4th 646, 695 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*), we observed that an identically phrased question was "not a model of clarity." Putting aside problems of grammar and agreement flowing from the awkward italicized phrase, we note that the remainder of the question essentially tracks the language of the California

to control my prejudices but depending on what the differences were I might ascribe more or less weight to that person." Addressing that prospective juror orally in open court, the trial judge referred the individual to his response to the questionnaire inquiry and then stated: " I am going to give you instructions on how to judge the credibility of a witness, how you can tell whether a witness is telling the truth and telling a lie, and it has nothing to do with any racial characteristics or ethnic characteristics or any different life style than yours. That is not to be considered in determining whether a witness is telling the truth or not. [¶] Do you think that you can follow that?" The prospective juror replied, "Yes, sir." Defense counsel thereafter exercised a peremptory challenge to excuse that prospective juror. If counsel had believed that further inquiry was necessary in this instance or with regard to other prospective jurors, he could have submitted additional questionnaire inquiries or suggested additional oral questions. As noted *ante*, defense counsel's failure to do so forfeits the claim on appeal. (*Avena, supra,* 13 Cal.4th 394, 413.)

Even if we were to agree that the voir dire examination was flawed, we would not find any reversible error. Addressing this same issue in another capital case, *People v. Holt* (1997) 15 Cal.4th 619, 661 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*), we rejected the claim of error, observing that "[u]nless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal." Defendant asserts that *Holt* is distinguishable, in that counsel in that case were permitted to participate directly in the voir dire process by asking questions of prospective jurors, whereas in the present case the trial court foreclosed that direct form of participation. As observed *ante*, however, the trial court did not foreclose counsel from suggesting additional questions to be put to specific prospective jurors, and defense counsel apparently found no need to do so.

Relying principally upon *Taylor, supra,* 5 Cal.App.4th 1299, defendant insists that the trial court should have made further inquiry into possible racial bias against him. Defendant argues that the court in *Taylor* found such bias under roughly analogous circumstances and urges that we do so here as well.

The Court of Appeal in *Taylor* reviewed applicable federal and state authority (including high court cases relied upon by defendant, *Turner v.*

---

Standards of Judicial Administration, section 8.5(b)(18), which proposes the following wording: "It may appear that one or more of the parties, attorneys or witnesses come from a particular national, racial or religious group (or may have a life style different from your own). Would this in any way affect your judgment or the weight and credibility you would give to their testimony?" In any event, it does not appear that any juror in the present case was confused by the language used.

*Murray* (1986) 476 U.S. 28 [90 L.Ed.2d 27, 106 S.Ct. 1683] (*Turner*) and *Mu'Min, supra,* 500 U.S. 415), concluding that "an interracial crime is a 'special circumstance' in which inquiry about racial prejudice must be made." (*Taylor, supra,* 5 Cal.App.4th at p. 1315.) The appellate court proceeded to reject the defendant's claim that the voir dire in that case "was improper because the [trial] court preceded some of its questioning (including the voir dire on racial prejudice) with statements that 'signaled' the proper answer. It is not error for a judge to remind prospective jurors that racial prejudice has no place in the courtroom. As Justice Kennedy observed in *Mu'Min,* a trial judge may choose to ask what information a prospective juror has about a subject, but 'the judge can also evaluate impartiality by explaining the trial processes and asking general questions about the juror's commitment to follow the law and the trial court's instructions.' (*Mu'Min v. Virginia, supra,* 500 U.S. at p. [451], dis. opn. of Kennedy, J.)" (*Taylor, supra,* 5 Cal.App.4th at p. 1316.)

The court in *Taylor* continued: "Having said this, we must also say that the [trial] court should have made further inquiry in the area of possible racial bias against defendant. [¶] As we have discussed, the trial judge asked the prospective jurors if any of them had any quarrel with the principle that no one should be found guilty because of race, creed, color, religion or national origin. The judge also asked whether they would put aside any biases and prejudices they may have had. But the court asked no questions designed to elicit whether any juror actually held such bias. In a case such as this, where there is a potential of racial or other invidious prejudice against the defendant, a further inquiry should be made." (*Taylor, supra,* 5 Cal.App.4th at p. 1316.)

In conclusion, the court in *Taylor* stated: "The failure to do so in this case is harmless, for two reasons. First, the trial court repeatedly emphasized the importance of juror neutrality and a fair trial. Second, both counsel were specifically invited to ask the court to conduct further voir dire on any proper subject, including possible racial bias, but were satisfied that it was not necessary to do so." (*Taylor, supra,* 5 Cal.App.4th at p. 1317.)

The same reasoning applies here. As in *Taylor, supra,* 5 Cal.App.4th 1299, 1317, even assuming that the trial court should have asked additional questions designed to elicit whether any prospective juror actually held a racial bias, any such error would have been harmless for the reasons described. We cannot say that the voir dire examination that was conducted was "so inadequate that . . . the resulting trial was fundamentally unfair." (*Holt, supra,* 15 Cal.4th 619, 661.)

Defendant also asserts that the trial court's voir dire examination was insufficient to reveal possible biases resulting from exposure to pretrial

publicity concerning the Subway crimes and defendant's arrest. Once again, if defense counsel believed that further inquiry was necessary with regard to any particular prospective juror, he could have submitted additional questionnaire inquiries or suggested additional oral questions—and his failure to do so forfeits that claim on appeal. (*Avena, supra,* 13 Cal.4th 394, 413.) In any event, as explained *post,* on the merits there is no basis for defendant's claim of error.

The juror questionnaire contained numerous inquiries related to the issue of pretrial publicity. In addition to asking each prospective juror what, if anything, he or she already had learned about the case or defendant, from what source such information had been obtained, and whether that information made the prospective juror favor one side or the other, the questionnaire asked: "33. What newspapers and periodicals do you read frequently? [¶] (a) What portion(s) do you read? (Front page? Sports? Editorials? Crime stories?) [¶] (b) Do you try to follow major crime stories? (Yes? No?) [¶] Which stories did you follow? . . . [¶] 34. What radio and television broadcasts have you heard or seen frequently during the past year? [¶] (a) Did you follow any criminal cases in the news? (Yes? No?) [¶] What cases? [¶] What did you learn about these cases? [¶] 35. What are the most serious criminal cases you have followed in the media during the last year? [¶] 36. Do you try to follow stories about the functioning of the criminal justice system? (Yes? No?) . . . [¶] 37. If the court instructs you not to read, view, or discuss any news media coverage of this case, will you follow the court's instructions? [¶] . . . [¶] 41. Do you subscribe to or regularly read any newspaper, or periodicals? If so, please state them . . . ."

Defense counsel appended to his motion for attorney-conducted voir dire copies of 12 newspaper articles concerning the Subway crimes, all of which were at that time at least 14 months old. In denying that motion, the trial court observed that it had read each of the completed juror questionnaires and found that "very, very few, if any of the prospective jurors have detailed memory of this incident."

Subsequently, the trial court questioned prospective jurors whose questionnaire responses indicated knowledge of defendant's case. Although defendant characterizes that followup questioning as cursory and incomplete, the record reveals that the court repeatedly probed whether any information obtained would cause the prospective juror to be biased, and each assured the court that he or she would be fair and impartial. For example, defendant highlights one prospective juror who ultimately sat as a juror at the first trial. The juror had indicated in his written questionnaire responses that he would

have no difficulty keeping an open mind, but also noted that he had learned of the case in the newspaper and on television. The trial judge, in followup questioning, observed that the juror had not answered the specific questionnaire inquiry, "What, if anything, have you already learned about this case or the defendant?"—and again posed that question to the juror. The juror answered, "I don't know anything about the defendant. I read it when it first came out in the paper. That's all. This is close to where I live." The trial judge asked whether the information received made the juror favor either the prosecution or the defense, and the juror responded, "no." When the trial judge subsequently asked, "Do you try to follow stories about the functioning of the criminal justice system?," the juror responded, "I read 'em, yeah." Once again, defense counsel did not request further questioning and, in our view, defense counsel's conduct was reasonable: the questionnaire responses and further answers to followup questioning by the trial judge dispelled any concern that the juror had been tainted by pretrial publicity.

■ As the high court observed in *Mu'Min, supra*, 500 U.S. 415, 427, "wide discretion [is] granted to the trial court in conducting *voir dire* in the area of pretrial publicity. . . ." Although defendant faults the trial judge for failing to ask specific questions concerning the specific content of media publicity, the trial judge's failure to do so in the presence of other prospective jurors who had not been exposed to the same material was reasonable, and doing otherwise would have risked exposing the others to the publicity. (*Id.*, at p. 425; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 737 [11 Cal.Rptr.3d 236, 86 P.3d 302] (*Cleveland*).) Failure to ask such questions in a sequestered voir dire examination is constitutional error only if that failure "render[s] the defendant's trial fundamentally unfair." (*Mu'Min, supra*, 500 U.S. 415, 426.) On this record, in which relatively mild publicity was at least 14 months old, thereby minimizing its impact (see *Dennis, supra*, 17 Cal.4th 468, 524 [noting, in context of change-of-venue determination, that passage of time can dispel the prejudicial effect of pretrial publicity]), and where defense counsel failed to ask the court to pose any additional question to any prospective juror, defendant cannot establish that the resulting guilt phase trial was fundamentally unfair. Indeed, as we have observed, " 'The failure to exhaust peremptories is a strong indication "that the jurors were fair, and that the defense itself so concluded." ' " (*Ibid.*) As explained *ante*, in view of the circumstance that after exercising only 14 of his 20 peremptory challenges, counsel ended up with a jury that hung seven to five on the issue of penalty, there appears to be no reason to question defense counsel's apparent conclusion that the jurors would be fair to defendant.[15]

---

[15] We also reject defendant's claim that it was error for the prosecution to use its peremptory challenges to excuse prospective jurors who expressed reservations concerning imposition of the death penalty. Assuming the prosecution so acted, it was entitled to do so (*People v.*

B. *Guilt Phase Claims*

1. *Exclusion of evidence of third party culpability and impeachment evidence*

Defendant contends that the trial court erred by excluding his proffered evidence of third party culpability and impeachment evidence concerning prosecution witnesses Williams and Aldridge. The proffered evidence was as follows. First, approximately 10 days after defendant was arrested, Williams and Aldridge were stopped and arrested by the Beverly Hills police at 1:30 a.m. (approximately the same time as the Subway crimes), and subsequently each was convicted of a misdemeanor, possessing a concealed handgun. Second, defendant asserts that the trial court excluded evidence of a police report that, according to defendant, contained information that a civilian witness—one "Ralph Dudley"—reported to a police officer that he had seen a gray Mustang (like Williams's car) in the alley behind the Subway shop at the time of the crimes. As explained *post*, we conclude that the trial court did not err in excluding evidence of the handgun conviction. Moreover, because the appellate record does not support defendant's claim that the trial court "excluded" any police-report evidence, we must reject that aspect of the claim on appeal.

a. *Evidence that Williams and Aldridge suffered convictions for possession of a concealed handgun*

Defense counsel sought to introduce evidence of Williams's conviction for possession of a concealed handgun for, as counsel explained, "dual purposes": first, as evidence of third party culpability in the Subway crimes and, second, as impeachment of Williams's credibility. The trial court ruled against introduction of the evidence for either purpose, reasoning, with regard to third party culpability, that the evidence was inadmissible under our decisions in *People v. Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862] (*Sandoval*), and *People v. Alcala* (1992) 4 Cal.4th 742 [15 Cal.Rptr.2d 432, 842 P.2d 1192] (*Alcala*), but that the court would reconsider that determination "subject to other evidence coming in." Turning to the use of the proffered handgun conviction as impeachment evidence, and

*Champion* (1995) 9 Cal.4th 879, 907 [39 Cal.Rptr.2d 547, 891 P.2d 93]) and did not thereby deny defendant the right to a jury drawn from a representative cross-section of the community. (*People v. Pinholster* (1992) 1 Cal.4th 865, 913 [4 Cal.Rptr.2d 765, 824 P.2d 571].) We also reject defendant's similar claim that the exposure of prospective jurors to the questioning of other jurors concerning their ability to impose the death penalty, combined with the dismissal of some of those prospective jurors for cause or pursuant to peremptory challenges, produced a more conviction-prone and death-prone jury, in violation of defendant's Sixth Amendment right to an impartial tribunal. (See *People v. Carrera* (1989) 49 Cal.3d 291, 331 [261 Cal.Rptr. 348, 777 P.2d 121], and cases cited.)

after hearing an offer of proof concerning the proposed testimony of Williams (which set forth, in broad outline, his subsequent testimony described *ante*), the trial court reasoned that, although the misdemeanor conviction "may [reflect] a crime of moral turpitude," whatever "slight relevance" and probative value the proposed evidence had with respect to Williams's veracity was outweighed by the prospect of "confusing the issues to the jury, especially in light of the third party culpability aspect, even though I would instruct the jury [not to consider the evidence for any purpose other than impeachment]."

Defense counsel subsequently made the same "dual purposes" motion concerning Aldridge's handgun conviction, and the trial court, after hearing a further offer of proof (which set forth, in broad outline, Aldridge's subsequent testimony described *ante*), denied the motion as to both proposed uses of the proffered evidence.

As explained *post*, the trial court rulings were correct.

▪ With regard to third party culpability, we note that *Sandoval, supra,* 4 Cal.4th 155, 176, and *Alcala, supra,* 4 Cal.4th 742, 792, both followed *People v. Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99] (*Hall*). In *Hall,* we recognized that third party culpability evidence is admissible if it is "capable of raising a reasonable doubt of [the] defendant's guilt," but also observed: "[W]e do not require that *any* evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: *there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.*" (*Hall, supra,* 41 Cal.3d at p. 833, italics added.) As we also explained in *Hall,* in making these assessments "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)."[16] (*Hall, supra,* 41 Cal.3d at p. 834.)

In reviewing an assessment made by a trial court under Evidence Code section 352, we shall not disturb the ruling on appeal absent a finding that the trial court abused its discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 372–373 [110 Cal.Rptr.2d 272, 28 P.3d 34] (*Lewis*).) We find no such abuse

---

[16] Evidence Code, section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create the substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

of discretion here. The crimes for which Williams and Aldridge were arrested approximately 10 days after defendant's arrest had at most very slight probative value concerning the issue of third party culpability. Contrary to defendant's claim that this evidence supported an "obvious inference . . . that Williams and Aldridge were on a robbery spree which may have included the Subway . . . crimes," the proffered evidence did not directly or even circumstantially link Williams or Aldridge to the Subway crimes. *Their* firearms were shown by ballistics evidence *not* to have fired the bullets discharged during the Subway shootings. By contrast, as we have noted, defendant's gun was determined to have fired the bullets that killed the Subway victims. In view of this evidence, the trial court reasonably concluded that the proffered arrest evidence was insufficient to raise a reasonable doubt that Williams and/or Aldridge, instead of defendant, committed the Subway crimes.

■ The trial court's ruling concerning impeachment also was correct. It is clear, as defendant argues, that Williams and Aldridge were key prosecution witnesses and that defendant had a strong interest in impeaching them, both in order to blunt their damaging testimony *and* in order to promote his own theory that they, not he, were the perpetrators of the Subway crimes. We also agree with defendant that the misdemeanor convictions suffered by Williams and Aldridge reflected a crime of moral turpitude and therefore were relevant to the witnesses' honesty and veracity. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295–296 [14 Cal.Rptr.2d 418, 841 P.2d 938].) Admission of such evidence, however, is subject to the trial court's discretion to exclude it under Evidence Code section 352. As noted *ante,* a trial court's broad latitude in this respect will not be upset on appeal absent a showing of abuse of discretion. (*Lewis, supra,* 26 Cal.4th 334, 372–373.)

We discern no such abuse of discretion. As the trial court observed, the slight relevance and probative value of the evidence with respect to the veracity of Williams and Aldridge were outweighed by the prospect of confusing the issues—in particular, the jury might use that evidence not only with regard to veracity, but also (despite the trial court's possible limiting instructions concerning third party culpability evidence) for a purpose that the court had determined would be improper under the circumstances.

■ We similarly reject defendant's various claims that the trial court's exclusion of the proffered evidence violated his federal constitutional rights to present a defense, to confront and cross-examine witnesses, and to receive a reliable determination on the charged capital offense. There was no error under state law, and we have long observed that, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's

[state or federal constitutional] right to present a defense." (*Hall, supra,* 41 Cal.3d at p. 834; see also *Lewis, supra,* 26 Cal.4th at pp. 373–374.)[17]

Finally, even if we were to assume that the trial court erred in excluding the proffered evidence, any state law error would be harmless under the "reasonable probability" test of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*) and, indeed, any federal constitutional error would be harmless under the "beyond a reasonable doubt" test of *Chapman v. California* (1967) 386 U.S. 18, 23–24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*). Strong evidence linked *defendant* to the crimes. Defendant had been employed at the Subway shop and knew its procedures, the location of the safes and the backdoor exit, and the general layout of the premises. He needed money and had talked of robbing the shop and killing its staff— indeed, he even admitted discussing the robbery with Williams and Aldridge in the context of pointing out problems with their own alleged suggestions for the robbery. James, after initially failing to do so, identified defendant as the man she had seen in the shop immediately prior to the shootings. Defendant conceded being at the scene of the crime immediately after the shootings (and indeed while one of the victims still was alive), and his fingerprints were found on a bag containing the final purchase entered into the shop's register. The bullets that killed the two Subway victims were fired from defendant's gun. On the day after the crimes, defendant attempted to pay hundreds

---

[17] At oral argument, counsel for defendant suggested that the United States Supreme Court's recent grant of certiorari in *State v. Holmes* (2004) 361 S.C. 333 [605 S.E.2d 19] (see *Holmes v. South Carolina* (2005) ___ U.S. ___ [162 L. Ed.2d 932, 126 S.Ct. 34]) assists him. We disagree. In *Holmes* the prosecution offered forensic evidence that linked the defendant to the rape and murder of an elderly woman. The evidence included DNA samples found on the defendant's underwear, and a palm print found on the inside of the victim's front door. The trial court denied admission of extensive third party culpability evidence from numerous witnesses. Some of those witnesses would have testified that another person, "Jimmy," was close to the crime scene at the time of the crime. Other witnesses would have testified that Jimmy had acknowledged to them the defendant's innocence and his own guilt in the crime. A final witness would have testified that Jimmy had confessed to the crimes, that the witness had been pressured to testify falsely against the defendant at the defendant's trial, and that the authorities had "manufactured" the DNA and palm print forensic evidence described *ante.* The South Carolina Supreme Court (with one justice dissenting) explained that under South Carolina law "where there is strong evidence of an appellant's guilt, especially when there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence" (*State v. Holmes, supra,* 605 S.E.2d at p. 24), and went on to conclude that because of the strong evidence of the defendant's guilt in that case, the exclusion of third party culpability evidence was proper. Hence, as reflected in *Holmes,* South Carolina law apparently precludes a criminal defendant from introducing evidence of a third party's culpability whenever other evidence, especially forensic evidence, strongly supports the defendant's guilt. This very restrictive rule concerning a defendant's ability to present evidence of third party culpability—described as "unique" in the petition for certiorari in *Holmes*—does not apply in California, and the high court's grant of certiorari in *Holmes* does not affect our analysis of the claims presented in the current appeal.

of dollars of rent in cash and also offered a $25 deposit in $1 bills. He then bragged, both to his friend Aldridge and to his coworker Ostrander, about his role in the robbery and killings. In view of this evidence, even if the jury had been informed of the handgun convictions suffered by Williams and Aldridge (and indeed, even if the jury were to credit defendant's testimony and infer from it that Williams, and possibly Aldridge as well, also was present during the crimes), we cannot conclude that would have raised a reasonable doubt among the jurors regarding *defendant's* guilt of the Subway shop crimes. We conclude that a different result would not have been reasonably probable absent the trial court's exclusion of the proffered evidence and, indeed, that any alleged error would have been harmless beyond a reasonable doubt.

> b. *Evidence that a witness saw Williams's car at the scene of the crime*

Los Angeles Police Detective Peggy Moseley assisted in the crime investigation and assembled case-related materials in a so-called murder book—a compilation of reports, including leads and tips, relating to the Subway shop crimes. Moseley, called as a defense witness, testified that the book totaled approximately 1,200 pages contained in three volumes, and that she periodically reviewed the book "to sift information" and "follow up on clues and evidence" in the case. Defense counsel asked: "In doing so do you recall receiving or becoming aware of any information that someone had imparted to the Los Angeles Police Department the fact that there had been a gray Mustang lurking in the area of this particular Subway sandwich shop?" At that point, the prosecutor successfully objected on hearsay grounds.

Defense counsel thereafter asked: "Did you personally conduct any interviews with anyone who indicated the presence of a gray Mustang at the scene?" Detective Moseley replied, "Not that I recall." Defense counsel asked: "Do you recall a witness by the name of Ralph Dudley?" Moseley replied, "No, I don't." Defense counsel made no offer of proof to establish that any admissible evidence supported an assertion that "Ralph Dudley" or any other witness had reported observing a gray Mustang near the crime scene, and instead stated that he had no further questions. After brief cross-examination, Moseley was excused.

Defendant now claims that the trial court erroneously "granted the prosecutor's motion to exclude" this evidence and "prevented defense counsel from questioning Detective Moseley about Ralph Dudley's sighting of the gray Mustang in the alley behind the Subway." The record, however, does not support this characterization. Instead it shows simply that counsel was

allowed to question Detective Moseley about "a witness by the name of Ralph Dudley" and that the detective did not recall any such witness. Nor does the record support defendant's contention that "Ralph Dudley," or anyone other than defendant, made a "sighting" of a gray Mustang at the crime scene.[18] Because there was no offer of proof in this regard, there is no basis in the appellate record upon which to conclude that the "murder book" contained a report concerning an observation by "Ralph Dudley," or anyone else, of such a car near the scene of the crimes and at the time they were committed. Accordingly, we reject defendant's claim that the trial court erroneously "excluded" any such evidence at the guilt phase of the trial. As far as we can discern, no such evidence was offered or excluded.

In any event, assuming that the challenged evidence in fact did exist and that the trial court (erroneously) excluded it, for the reasons discussed in part II.A.1.a., any error would have been harmless under both the *Watson* standard and the *Chapman* standard.

### 2. *Admission of testimony concerning probable relative positions of the victims and the shooter*

Christopher Rogers, M.D., a board-certified forensic pathologist and deputy medical examiner employed by the Los Angeles County Coroner's Office, testified that he had performed "hundreds" of autopsies involving gunshot wounds and had been qualified as an expert witness on approximately 200 occasions. Dr. Rogers testified that, in his opinion, each victim died of a bullet wound to the top of the head fired at very close range or while the firearm was in direct contact with the victim. He also described the trajectories of the shots. Defense counsel did not object to this evidence, and defendant does not now assert any error with respect to that aspect of Dr. Rogers's testimony.

Dr. Rogers further testified—over defense objection—concerning the probable respective positions of the shooter and the two victims at the time of the shootings. On direct examination, Dr. Rogers was asked to consider the height of defendant (five feet 10 to 11 inches), the height of victim James White (six feet one inch), and the location and trajectory of the entry wound in White's forehead, and to consider three possible scenarios relating to that victim. First, assuming White had been standing, Dr. Rogers testified that the shooter's hand might have been positioned essentially even with and slightly above the victim's head—which would have meant that the shooter either had

---

[18] In his reply brief, defendant claims, without citation to the record, that "Ralph Dudley is identified in a police report provided to the defense in discovery. According to the police report, Mr. Dudley reported seeing the gray Mustang as defense counsel stated in the trial court."

held the gun over his head or stood on something so as to be higher than the victim's head. Second, assuming White had been lying on the floor at the time of the shooting, Dr. Rogers testified that, based upon the physical evidence, the shooter might have been lying on the floor or crouched next to him. Third, assuming that White had been shot while he was kneeling on the floor, Dr. Rogers testified that shooter would have been standing next to him.

Dr. Rogers conceded that each of the three described posture scenarios was possible, but the first two would have meant that the shooter had been in an awkward position. Hence, in his opinion, those scenarios were less likely than the third theory, that victim White was kneeling next to the shooter, who would have been standing and holding the gun "in a somewhat natural position" at waist level. On cross-examination, Dr. Rogers acknowledged that, based upon the evidence, there were a "multitude of different positions that could have been assumed by the decedent and the person inflicting the injury."

During closing argument, the prosecutor asserted that Dr. Rogers's testimony corroborated Ostrander's description of defendant's bragging about how he had carried out the shootings and that James White must have been shot while he was on his knees, "praying for his life."

Defendant now contends that this aspect of Dr. Rogers's testimony improperly was admitted and requires reversal of the guilt phase judgment for the following reasons: (1) the expert testimony was not relevant and in any event was not the proper subject of expert testimony because the jurors were capable of drawing their own conclusions about the manner of the shootings; (2) even if the testimony was relevant and helpful to the jury, the prosecution failed to lay a proper foundation for that expert opinion; and (3) the trial court's admission of this testimony was an abuse of discretion under Evidence Code section 352 and violated his state and federal constitutional rights.

A trial court's determination to admit expert evidence will not be disturbed on appeal absent a showing that the court abused its discretion in a manner that resulted in a miscarriage of justice. (*People v. Catlin* (2001) 26 Cal.4th 81, 131 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Here, there was no such abuse of discretion. As the trial court recognized, the challenged evidence was relevant to prove one of the prosecution's theories of the homicides—that of premeditated and deliberated murder. An execution-style shooting of a kneeling victim clearly supported that theory and was relevant to prove it. (Cf. *People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d

412, 956 P.2d 374].) The challenged evidence also was relevant to corroborate the testimony of prosecution witnesses Williams, Aldridge, and Ostrander.[19]

■ A closer question is whether the testimony properly was the subject of expert opinion evidence. Evidence Code section 801, subdivision (a) limits such evidence to that which is "[r]elated to a subject . . . sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." As defendant observes, in considering this testimony the trial court stated: "I have to say that based upon the proffered offer of proof that the People have made that it doesn't take too much expertise to render an opinion as to the position of the bodies based upon the medical evidence. In fact, it is something that *almost* a lay person, given these facts, could render." (Italics added.) The trial court ultimately allowed the expert testimony.

We find no error. Victim James White was discovered lying facedown in a pool of blood on the Subway shop's floor. As the People observe, unassisted by Dr. Rogers's challenged testimony and "[r]elying on intuition alone, the jurors might reasonably have had no idea how his fatal wound was inflicted," but Dr. Rogers's testimony provided the jurors with an informed context, letting them know that, "although the shooter might have assumed any number of positions when necessarily placing the gun perpendicular to the crown of the victim's head, the least awkward position would be that of the victim kneeling." This evidence indeed would "assist the trier of fact" (Evid. Code, § 801, subd. (a)), both in determining whether the killing was premeditated and deliberated, and in assessing the credibility of the prosecution witnesses who testified concerning defendant's precrime statements that he planned to execute witnesses and his postcrime statements that he shot the kneeling victims.

■ Nor do we find that the prosecution failed to lay a proper foundation for the challenged aspect of Dr. Rogers's testimony. The witness clearly was qualified to testify concerning gunshot wounds and to render the quite limited opinion that he eventually proffered: that, in view of the location of the wounds and their trajectories, of the three general scenarios presented—the shooter standing next to a standing victim, the shooter lying or crouched near a lying victim, or the shooter standing near a kneeling victim—the last was the least awkward and most likely. Contrary to defendant's suggestions that

---

[19] As noted *ante,* Williams and Aldridge earlier testified that, prior to the commission of the Subway crimes, defendant had told them he would kill any witnesses "execution style" by shooting them in the head. Aldridge further testified that defendant, speaking of the Subway victims, bragged that he had "blown them away" by shooting them in the head. Ostrander testified that defendant bragged he had "popped those two kids" in the head even though they had pleaded, " 'Please don't shoot me. Don't shoot me.' "

such testimony could be given only by one qualified as a crime scene reconstructionist, the opinion evidence here at issue did not require that the witness have expertise *beyond* that which was shown—that is, that he was an experienced pathologist who possessed extensive familiarity with gunshot wounds. The trial court did not abuse its discretion in finding Dr. Rogers qualified to give the challenged opinion. (*People v. Farnam* (2002) 28 Cal.4th 107, 162 [121 Cal.Rptr.2d 106, 47 P.3d 988] ["Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " '*clearly lacks* qualification as an expert.' " ' "]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1207 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

Finally, we reject defendant's contention that the trial court should have concluded that the challenged testimony was more prejudicial than probative, and hence that its introduction was barred under Evidence Code section 352 and violated defendant's state and federal constitutional rights. Evidence is not "unduly prejudicial" under the Evidence Code merely because it strongly implicates a defendant and casts him or her in a bad light, or merely because the defendant contests that evidence and points to allegedly contrary evidence.[20] Instead, undue prejudice is that which "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134 [36 Cal.Rptr.2d 474, 885 P.2d 887] (*Crittenden*); see also *People v. Garceau* (1993) 6 Cal.4th 140, 178 [24 Cal.Rptr.2d 664, 862 P.2d 664].) As noted *ante*, the challenged evidence was highly relevant to the prosecution's theory of premeditated and deliberated murder and also relevant as corroboration of the three prosecution witnesses who testified concerning defendant's stated plan to execute witnesses and his boasts of having shot the victims in the head. Evidence of deliberate, premeditated killing often is very disturbing, but the jury properly was instructed not to be influenced by passion, sympathy, or prejudice and to conscientiously consider and weigh the evidence in applying the law. The trial court acted within its discretion in finding that the probative value of the evidence outweighed the risk of prejudice. (*Crittenden, supra,* 9 Cal.4th at p. 134 [finding that the trial court

---

[20] Relying upon the evidence of the footprint found on the shop counter and the testimony of witness James, defendant theorizes that the shooter indeed fired while the victims were in a standing position and not while one or both were kneeling. Such a scenario, defendant observes, "clearly does not match the cold 'execution style' killings described by the prosecution witnesses and supported by the coroner's opinion . . . ." But, as noted *ante,* James testified that she heard "the noise" (that is, apparently, the first shot) and *thereafter* "immediately saw the customer either run around the counter or jump on the counter and over." Contrary to defendant's suggestion, this testimony does not support the theory that the shooter fired while standing on the counter.

"reasonably could determine that the probative value of the [crime scene photographs of victims] outweighed their potentially prejudicial effect"].) We discern no error.

### 3. *"Readback" of testimony*

During guilt phase deliberations, the jury sent a note to the court requesting that three portions of the testimony be "re-read": (1) The prosecution's fingerprint expert's testimony "regarding the position of fingerprints on the bag. Also, the number of prints and whether put on at the same time." (2) "Testimony of [defendant] regarding whether Tai [Williams] was home when [defendant] returned home on Sunday morning." (3) "Whether [defendant] had the gun Sunday morning after he returned home." After reading the jury's communication to the parties in open court (but without the jury present), the trial judge observed that, as to the second request, the reporter had advised that there was no such testimony. Counsel for both parties concurred, and the court stated it would so advise the jury. Concerning the other two requests, the court commented: "I take it all the testimony has been found as to those items and the jury and alternates will be read those in the jury room." The court then asked, "Now, does counsel wish to be present during the reading or rereading of the testimony?" Counsel for both parties answered in the negative and, after defense counsel consulted with defendant, defendant also stated he did not wish to be present.

The jury returned to the courtroom, and the trial court explained that, "after a thorough search, and after discussion with counsel, I can tell you right now that there was no testimony of [defendant] regarding whether Tai [Williams] was home when [defendant] returned home on Sunday morning." The court advised the jury that the other two requested items would be read back. At the trial court's direction, the reporter thereafter entered the jury room, spent approximately 20 minutes reading back testimony, and then left the jury room, at which time deliberations resumed. The reporter's transcript reveals that the testimony read back to the jury in response to the jury's third question ("Whether [defendant] had the gun Sunday morning after he returned home") was the following: "Volume 11, page 1176, line 19 to line 24 [(an excerpt from defense counsel's redirect examination of defendant) and] page 1069, line 23 to page 1073, line 17 [(from the prosecution's cross-examination of defendant)]."

■ Defendant contends the trial court's statement concerning the first and third questions—"I take it all the testimony has been found as to those items and the jury and alternates will be read those in the jury room"—reveals that the trial court "let the court reporter decide which testimony was responsive to the jurors' questions" and failed to participate in the planning and

supervision of the readback. Thus, defendant argues, the trial court abdicated control over the readback process in violation of section 1138, which provides that, when a jury requests a readback of testimony, "the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." Relying upon *People v. Litteral* (1978) 79 Cal.App.3d 790, 794 [145 Cal.Rptr. 186] (*Litteral*) (finding reversible error under section 1138 and admonishing trial courts to exercise "strong supervision" over such matters), defendant argues that reversal is warranted.

As we recently observed in *Roldan, supra,* 35 Cal.4th 646, 729, *Litteral, supra,* 79 Cal.App.3d 790—a case in which a trial court *refused* a jury's request for a readback of testimony—is distinguishable. Moreover, as we also observed in *Roldan,* a claim of error in the selection of the testimony read back to a jury, as well as any alleged impropriety or failure to comply with section 1138, is waived by defense counsel's failure to object at the time the trial court directed the readback. (*Roldan, supra,* 35 Cal.4th at pp. 729–730.) But even if we were to overlook the absence of an objection, we conclude defendant's claim is without merit.

Viewing the record in context, we question whether the record supports defendant's theory that the trial court let the court reporter decide which testimony was responsive to the jurors' questions. As the People observe, within a few minutes of the trial court's comment made outside the presence of the jury ("I take it all the testimony has been found as to those items . . ."), the court, in addressing the jury, implied that, with regard to its second request, the court *personally* had determined that no such testimony existed: "After a thorough search, and after discussion with counsel, I can tell you right now that there was no [such] testimony . . . ." In view of the court's latter comment, the People contend it is doubtful that the trial court abdicated its responsibility concerning the first or third item requested for readback. Defendant, on the other hand, argues that, when viewed in context, the trial court was not representing that it had read *any* of the prior testimony under consideration, and that its comment merely relayed to the jury the prior "representations [made to the court by] counsel and the court reporter that this portion of the testimony requested does not exist."

We need not resolve this fact-specific dispute, because it is well established that " '[a] conviction will not be reversed for a violation of section 1138 unless prejudice is shown' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 1027 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*)) and, as explained *post,* in the present case there can be no such showing: if the trial court failed to monitor the readback of testimony as closely as it should have, any resulting error would have been harmless.

Defendant argues that too much testimony was read back in response to the jury's third question, some of which was "not relevant to the jurors' request," and that other "relevant and responsive" testimony was withheld. As the People observe, the material that defendant now asserts should *not* have been part of the material that was read back spanned three and one-half transcript pages of the prosecutor's cross-examination of defendant. All of that challenged material directly related to the time period concerning which the jury inquired—namely, "*after* [defendant] returned home" to Tai Williams's apartment on Sunday morning. The readback material established that defendant was in Williams's apartment from approximately 2:20 a.m. to 6:00 a.m., during which time he was fearful that Williams might kill him, and—in the sole passage that defendant concedes properly was read back to the jury—that defendant had his firearm with him at that time.

Defendant claims that parts of the passages read back, although pertinent to the time period concerning which the jury inquired, included material not directly related to the jury's specific question. Some of the questions and answers read back to the jury concerned whether defendant, during that time, thought about providing help for the two severely wounded victims whom he had observed at the Subway crime scene or considered calling the police. The material also contained a passage reflecting that, after defendant at one point stated he had been tired upon returning to the apartment in the early morning hours, the prosecutor asked, "Killing people wears you out, doesn't it?" Defendant argues that "[t]he repetition of this cross-examination, and particularly the gratuitous remark about killing people," was improper, and that "[t]his was not a balanced presentation of relevant testimony."

As we have observed, section 1138 "does not forbid giving the jury more than it requests so [that] it also receives the *context*" of the testimony. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 506 [117 Cal.Rptr.2d 45, 40 P.3d 754], italics added.) But even assuming that some of the testimony should not have been included in the readback, a violation of section 1138 ordinarily will not result in reversal of a conviction unless prejudice is shown (*Jenkins, supra,* 22 Cal.4th 900, 1027)—and here there was no prejudice. Earlier in the trial, the jury properly had heard the entire cross-examination of defendant, many parts of which forcefully emphasized the same points of which defendant now complains. In view of the substantial other evidence of defendant's guilt, it simply is not plausible that the *repetition* of some of those passages in response to the jury's request for a readback of testimony contributed significantly to the jury's verdict. Any state law error in this regard would have been harmless under the "reasonable probability" test of

*Watson, supra,* 46 Cal.2d 818, 836 and, indeed, any alleged federal constitutional error also was harmless under the "beyond a reasonable doubt" test of *Chapman, supra,* 386 U.S. 18, 23–24.[21]

Defendant finally contends that in one other respect—regarding the brief excerpt that was read back from defense counsel's redirect examination—"the readback process resulted in the jury not receiving testimony which was relevant and responsive to the request." We disagree. In that readback passage, defense counsel stated: "In response to [the prosecutor's] questions, you have indicated for us that you did have the gun in the apartment in the period between [two o'clock] or three o'clock in the morning and somewhere around six o'clock in the morning when you left." Defendant responded, "Yes, sir." But, defendant complains, the readback testimony did not include the very next question and answer posed on redirect examination: "Did you have it during the hours of, say, [11:00] o'clock on Saturday night and the time when you returned to that apartment?" "No, sir." Contrary to defendant's assertion that failure to read back the latter passage was error, this testimony appears to have been outside the scope of the jury's third question, which focused upon whether defendant had his gun in his possession *after* he

---

[21] We reject defendant's additional claim that any error was structural in nature and requires reversal per se. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 307–308, 309 [113 L.Ed.2d 302, 111 S.Ct. 1246] [regular " '*trial error*' " can be "qualitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt"; by contrast, "*structural*" error is a "defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards" (italics added)].)

*Riley v. Deeds* (9th Cir. 1995) 56 F.3d 1117 (*Riley*), upon which defendant relies for the contrary conclusion, is distinguishable. In that case, at a time when the state (Nevada) trial judge was absent from the court, a deliberating jury asked for readback of the crime victim's testimony. The judge's law clerk convened the court, explained that the reporter would read back the victim's testimony, and instructed the jury foreman to raise his hand when the jury had heard enough. The testimony was read back and, at the conclusion of the readback of the direct examination, the foreman raised his hand and the readback ended. (*Id.,* at p. 1119.) The appellate court observed: "In this case, the judge was not present when the jury requested that the testimony be read back, nor does the record reflect he was consulted about the matter. From what we can tell from the record, the judge's law clerk made the decision to grant the jury's request to read back the testimony. The jury was then given effective control of what testimony and how much of it would be read. The victim's testimony was read until the jury foreman decided the jury had heard enough." (*Id.,* at p. 1120.) In this setting, the appellate court found "a complete abdication of judicial control over the process" (*id.,* at p. 1121) and reversed without an assessment of prejudice. (*Ibid.*)

In the present case, by contrast, the trial judge was present when the jury requested that the testimony be read back, and was consulted concerning that matter. The trial court made the decision to grant the jury's request to read back the testimony; the jury was not given control of what testimony would be read back or how much of it would be read back, and by no means can it reasonably be said that the record reflects "a complete abdication of judicial control over the process." (*Riley, supra,* 56 F.3d 1117, 1121.) *Riley,* therefore, is distinguishable. Indeed, as the Ninth Circuit itself has recognized, "*Riley* was limited to the particular facts of that case . . . ." (*United States v. Arnold* (9th Cir. 2001) 238 F.3d 1153, 1155.)

returned to Williams's apartment. The jury did not ask whether defendant had possession of his gun immediately prior to his arrival at the apartment. Defendant fails to point to any other evidence pertaining to the jury's question but not included in the readback testimony. In sum, we perceive no error and, in any event, no prejudice.

### 4. Reasonable doubt and burden of proof instructions

Defendant claims that the standard "reasonable doubt" instruction (CALJIC No. 2.90), which at the time of trial in this case employed phrases such as "moral evidence" and "moral certainty," is "incomprehensible to a modern jury" and that its use here compels reversal of the judgment. We repeatedly have rejected this claim (e.g., *People v. Maury* (2003) 30 Cal.4th 342, 429 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*); *People v. Seaton* (2001) 26 Cal.4th 598, 668 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Ray* (1996) 13 Cal.4th 313, 346–347 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Jennings* (1991) 53 Cal.3d 334, 385–386 [279 Cal.Rptr. 780, 807 P.2d 1009] (*Jennings*)) and do so here as well.

We conclude likewise concerning defendant's related claim that the combination of two other standard instructions (CALJIC Nos. 2.01 and 8.83, both relating to circumstantial evidence) improperly lightened the prosecution's burden of proof. We repeatedly have rejected similar challenges to those instructions and do so here as well. (E.g., *Maury, supra,* 30 Cal.4th 342, 428; *People v. Hughes* (2002) 27 Cal.4th 287, 346–347 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990]; see also *Jennings, supra,* 53 Cal.3d 334, 385–386 [rejecting joint challenge to CALJIC Nos. 2.90 and 2.01].)

### 5. Asserted cumulative error

Defendant claims that cumulative error during jury selection and at the guilt and special circumstances phase of the trial requires reversal of the guilt phase judgment and the special circumstances findings. We have found no error, but, even assuming error (and, indeed, cumulative error), for the reasons set forth in part II.B.1.a. any such improprieties would have been harmless under the "reasonable probability" test of *Watson, supra,* 46 Cal.2d 818, 836, and even under the "beyond a reasonable doubt" test of *Chapman, supra,* 386 U.S. 18, 23–24.

### C. Penalty Phase Claims

As noted earlier, the initial penalty phase proceedings ended in a mistrial after the jury deadlocked seven to five in favor of imposing a

sentence of death. Nine months later, after the trial court relieved defendant's former trial counsel due to a conflict and appointed replacement counsel, the court empanelled a new jury to retry the penalty phase. From that jury's verdict and the resulting judgment of death, defendant raises the following claims.

### 1. *Asserted errors during jury selection*

Reprising claims similar to those raised and rejected with regard to the guilt and special circumstances phase of the trial (*ante*, pt. II.A.), defendant raises a number of challenges to the penalty phase jury-selection process. We do not find any of them meritorious.

Defendant suggests the trial court was unaware of its discretion to conduct oral voir dire as necessary and to allow attorney participation and questioning as appropriate. The record does not support defendant's position. At the retried penalty proceedings (as in the first trial), the court made it clear that counsel were free to seek to question the prospective jurors. Specifically, in response to questions whether, with respect to the voir dire procedures, if there arose "some follow-up questions that counsel may deem appropriate based on the questionnaire, do we ask to approach the bench?" and "May we ask to approach if we deem it appropriate?," the court responded, "Of course" and also advised counsel, "I may or may not ask if you wish to inquire."

Nor does the record support defendant's claim that the voir dire examination conducted by the trial court in the retried penalty proceedings was inadequate.

The questionnaire employed at the first trial was reused after being modified slightly to eliminate two subquestions concerning each prospective juror's ability to return a guilty verdict or a finding of special circumstances—issues previously resolved by the first jury. As in the first trial, the judge conducted an in-court voir dire examination of every prospective juror and asked each whether he or she wished to change any response made in the written questionnaire. The court further questioned all prospective jurors who failed to respond to any questionnaire inquiry or who gave ambiguous, conflicting, or otherwise problematic answers to questionnaire inquiries.

Finally, the court also asked each prospective juror two questions concerning his or her attitude concerning the death penalty.[22]

Defendant claims this process was inadequate because the questionnaire was lengthy, its administration was rushed, and the trial court conducted what defendant characterizes as a hasty and superficial voir dire examination that did not produce information sufficient for defense counsel to make (and for the court to rule upon) challenges for cause. Defendant additionally argues that the court's voir dire examination was defective insofar as it related to potential racial prejudice among potential jurors.

Because defendant failed to object to or suggest modifications to the questionnaire, he has forfeited any challenges to its length and allegedly undue complexity or any other aspect of its content. (*Avena, supra,* 13 Cal.4th 394, 413.) Even if we were to overlook that procedural failing, we would find defendant's challenges lacking in merit.

Contrary to defendant's arguments, there is no evidence that prospective jurors were unduly rushed in completing the questionnaire. They appear to have been given the questionnaire at approximately 11:30 a.m. and were told that they could return it at noon, or 1:30 p.m. at the latest. Resulting questionnaire inquiries that any prospective juror failed to answer were addressed by the judge during the voir dire examination of that prospective juror and, as in the first trial, in some instances the exchange disclosed that the prospective juror had not been confused by the question, but simply had left responses blank in lieu of responding "no" or "inapplicable." In other instances, the exchange revealed that the prospective juror needed more information before answering.

Although the trial court declared that counsel were free to seek to pose followup questions to the prospective jurors, defense counsel did not attempt to do so. At the end of the selection process, instead of stating dissatisfaction with the final jury, counsel announced that defendant "accept[ed] the jury as constituted"—indicating defense counsel's apparent satisfaction with the voir dire examination and with the resulting jury. We conclude that the described questionnaire sufficiently probed the prospective jurors' backgrounds and

---

[22] Without significant variation, the two questions asked of all prospective jurors were as follows:

(1) "Do you have such conscientious objections to the death penalty that regardless of the evidence in this case you would automatically, in every case, vote for a verdict of life imprisonment without the possibility of parole and never vote for death?"

(2) "Do you have such conscientious opinions regarding the death penalty, or at this phase of the trial, and regardless of the evidence, you would automatically, and [in] every case, vote for a verdict of death and never vote for a verdict of life imprisonment without the possibility of parole?"

views in numerous relevant areas and, together with the trial court's followup questions, provided an adequate basis upon which the parties were able to exercise challenges for cause as well as peremptory challenges.

We reach the same conclusion concerning defendant's specific claim that the voir dire process inadequately probed the possible racial bias of prospective jurors. As observed earlier, the questionnaire informed the prospective jurors that a party or witness "may come from a different nationality, racial or religious group," and it asked: "Would that fact affect your judgment or the weight and credibility you would give to his or her testimony?"[23] In addition, in response to defense counsel's request that the court's voir dire examination "address the . . . fact that my client is Black and the fact that the victims in this case are White," the trial court agreed to do so, thereafter addressing the group of prospective jurors as follows: "Now, one thing I will mention is the defendant, as you can see, is an African-American. The victims in this case are White. Now race is not an issue at a penalty trial and is not to be considered by you. [¶] Is there anyone on the panel before me that would ignore this dictate? [¶] Negative response." The trial court repeated the essence of this admonition and question at least five more times prior to the conclusion of the voir dire process.

Defendant relies upon *Turner, supra,* 476 U.S. 28, 36–37, in which the high court reversed a death judgment of a Black defendant convicted of killing a White victim, because the trial court erroneously had declined to ask *any* question during the voir dire examination concerning possible racial prejudices of the prospective jurors. Here, by contrast, the trial court probed that issue on two occasions, once in the questionnaire and again—at defense counsel's specific request—during the voir dire examination of the prospective jurors. If defense counsel believed that further inquiry was necessary, he could have submitted additional questionnaire inquiries or suggested additional oral questions. Again, defense counsel's failure to do so forfeits this aspect of the claim on appeal. (*Avena, supra,* 13 Cal.4th 394, 413.)

In any event, even if we were to overlook defendant's failure to preserve the issue, we would not find any reversible error. The voir dire examination concerning possible racial prejudice was not "so inadequate that . . . the resulting trial was fundamentally unfair . . . ." (*Holt, supra,* 15 Cal.4th 619, 661.) Even if we were to accept defendant's position that the group questions posed by the trial court to the various panels were not the most effective means of ferreting out possible racial prejudices and that the court should have inquired further concerning possible racial bias (see *Taylor, supra,* 5 Cal.App.4th 1299, 1316), we would conclude that the court's failure to do so

---

[23] See footnote 14, *ante.*

here was harmless. As in *Taylor,* "the trial court repeatedly emphasized the importance of juror neutrality and a fair trial," and "both counsel were specifically invited to ask the court to conduct further voir dire on any proper subject, including possible racial bias, but were satisfied that it was not necessary to do so." (*Id.,* at p. 1317.)[24]

### 2. Evidence that Williams and Aldridge were convicted of charges of concealment of a handgun and that a witness observed Williams's car at the scene of the crime

As noted *ante* in connection with the guilt phase of the trial, defendant claimed that the trial court improperly excluded evidence that, approximately 10 days after defendant's arrest, Williams and Aldridge were arrested in the early morning hours in Beverly Hills and subsequently were convicted of carrying concealed handguns in their car. (Pt. II.B.1., *ante.*) Defendant asserts that the court made the "same ruling" at the penalty phase retrial, thereby "prohibiting any defense questioning concerning Tai [Williams's] and Tommy [Aldridge]'s gun possession arrests."

The reporter's transcript page cited by defendant for the proposition that the trial court made such a ruling during the retrial of the penalty phase contains no such passage or ruling, nor does our review of the record of the penalty phase retrial reveal such a ruling. Indeed, the record reveals that defense counsel was permitted to cross-examine Aldridge concerning the essence of the firearm-concealment charges, resulting in the witness's acknowledgment that he and Williams had carried their guns with them to Beverly Hills and, the witness conceded, "ran into problems with having our guns illegally stored in the car." Accordingly, we reject the claim that the trial court excluded any such evidence.

Even assuming that the trial court improperly excluded evidence related to the concealed handguns, for the reasons discussed in part II.B.1.a., *ante* and because defense counsel in fact cross-examined Aldridge on the subject and elicited the testimony described, any state law error was harmless under the "reasonable possibility" standard of *People v. Brown* (1988) 46 Cal.3d 432,

---

[24] We note that at one point in the voir dire proceedings the trial court misspoke. Instead of telling one group of six prospective jurors that they were not to consider race in reaching their decision, the court said, "You all understand that race is not to be considered *until reaching* the penalty." (Italics added.) Of the six prospective jurors to whom the comment was directly made, one ultimately was selected to serve on the jury. In its subsequent admonishments the court properly and repeatedly advised, as it had earlier, that race had *no* place in the decisionmaking process. Trial counsel for defendant apparently either overlooked the court's misstatement or thought it unworthy of mention, and appellate counsel likewise did not raise the issue. Viewing the record as a whole, the trial court's single and obvious misstatement was harmless error.

448 [250 Cal.Rptr. 604, 758 P.2d 1135] (*Brown*), and any federal constitutional error was nonprejudicial under the "beyond a reasonable doubt" standard of *Chapman, supra,* 386 U.S. 18, 23–24.

Defendant also reprises his claim that the trial court improperly excluded evidence that witness "Ralph Dudley" observed Williams's car at the scene of the crime. As explained *post,* the record shows that, at the retried penalty proceedings (as at the first trial), defendant never *offered* evidence concerning "Ralph Dudley" or any other such witness and the trial court never excluded any such evidence.

The record reveals that during cross-examination of Aldridge, defense counsel established that the witness remembered testifying at the preliminary examination, and counsel then proceeded to read aloud a question that had been asked of Aldridge at that time: "Question: Did you know that Tai Williams's car was seen in the alley the night of the murders—." At that point the prosecutor successfully objected on the ground that defense counsel's inquiry "assumes facts not in evidence." When defense counsel immediately thereafter asked the witness where he was at 1:30 a.m. on the day of the crimes, the prosecutor approached the bench and, outside the presence of the jury, objected to "this entire line of questioning. This is dealing with third party . . . culpability. That's where he is going . . . ." Defense counsel made an offer of proof that defendant would testify (as he had at the first trial) that he was at the crime scene shortly after the shootings and saw Williams's distinctive gray Mustang departing from the alley behind the Subway shop, and that defendant "believes that Tommy Aldridge was with Tai Williams in the car that night." Defense counsel's offer of proof did not mention any witness named "Ralph Dudley" or an alleged sighting by that witness or by any such other witness (other than defendant himself) of a gray Mustang at the crime scene at the time of the crimes.

The trial court, citing *Hall, supra,* 41 Cal.3d 826, and *Alcala, supra,* 4 Cal.4th 742, agreed that defendant "does have a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about defendant's own guilt," but also concluded, as it had at the first trial, that defendant's offer of proof presented insufficient "direct or circumstantial evidence linking the third person[s] to the actual perpetration of the crime," sustaining the prosecutor's objection on that basis. As it had in similar circumstances at the first trial, however, the court added: "If, upon the testimony, your offer of proof through your client there is other evidence, I can change my [ruling]." Defense counsel responded, "[t]hat's fine," and,

when proceedings resumed before the jury, he withdrew his last question (concerning whether Aldridge knew that Williams's car had been seen at the crime scene) and announced he had no further questions.[25] Accordingly, we reject defendant's contention that the trial court erroneously "excluded" evidence of "Ralph Dudley's" alleged sighting of a gray Mustang at the crime scene. As explained *ante*, the defense offered no such evidence at the retried penalty phase of the proceedings, and the trial court did not exclude any such evidence.

In view of that determination, defendant's various claims that the trial court's "exclusion" of his proffered evidence violated his Eighth Amendment right to a reliable, individualized capital-sentencing determination necessarily fail as well. (*Hall, supra*, 41 Cal.3d at p. 834; *Lewis, supra*, 26 Cal.4th at pp. 373–374.)

Finally, even assuming that the challenged evidence in fact existed and that the trial court improperly excluded it, in view of the other strong evidence that linked defendant to the charged offenses any state law error would have been harmless under the "reasonable possibility" standard of *Brown, supra*, 46 Cal.3d 432, 448 and any federal constitutional error would have been nonprejudicial under the "beyond a reasonable doubt" standard of *Chapman, supra*, 386 U.S. 18, 23–24.

### 3. *Admission of testimony concerning probable relative positions of the victims and the shooter*

We concluded earlier that the trial court did not err in allowing Dr. Rogers, a Los Angeles County deputy medical examiner, to testify regarding the probable relative positions of the shooter and the victims. Dr. Rogers gave similar testimony at the retried penalty proceedings, at which time he again considered three possible scenarios for the wound suffered by victim James White: the shooter may have shot the victim while both were in a standing position (in which event the shooter may have stood on a chair or on the countertop); the shooter may have crouched or knelt next to the victim; or the shooter may have stood next to a kneeling victim. Dr. Rogers again testified that White's wound was consistent with the third scenario, but that "just based on the wound, I can't really determine which of those occurred."

Defendant contends the evidence was irrelevant. We disagree. Evidence suggesting that at least one of the victims could have been shot while

---

[25] Immediately thereafter, upon resumption of redirect examination, the prosecutor asked Aldridge, "Were you just relaying what the defendant told you [about Williams's car being seen at the crime scene] . . . whether it's true or not, merely what he said?" The witness responded, "Correct."

kneeling was relevant to aggravation of penalty under section 190.3, factor (a). For reasons previously discussed, we also reject defendant's claims that the evidence was not a proper subject of expert testimony and that it was given without proper foundation. Finally, we again reject defendant's contention that the trial court should have concluded that the challenged testimony was more prejudicial than probative and hence that its introduction was barred under Evidence Code section 352 and violated defendant's state and federal constitutional rights. As we have explained, evidence is not "unduly prejudicial" under the Evidence Code merely because it strongly implicates a defendant and casts him or her in a bad light or merely because the defendant contests that evidence and points to allegedly contrary evidence. Here, the challenged evidence was highly relevant to the prosecution's theory of premeditated and deliberated murder, and to corroboration of the testimony of the three prosecution witnesses who recounted defendant's stated intention to execute witnesses and his boasts of having shot the victims in the head. And, as noted *ante*, the evidence also was relevant in aggravation of penalty as a circumstance of the crime. The trial court acted within its discretion in concluding that the challenged evidence was more probative than prejudicial. (*Crittenden, supra,* 9 Cal.4th 83, 133–134.) We discern no error, statutory or constitutional.[26]

### 4. *Victim impact evidence*

Without objection, the parents and twin sister of Brian Berry, as well as the mother of James White, testified extensively at the retried penalty proceedings concerning certain attributes of each victim and the effects of the murders upon them and their families. Much of the testimony, which covers 37 transcript pages, was delivered in lengthy narratives, portions of which we reproduce *post*.[27]

---

[26] Defendant also reasserts a claim raised and rejected earlier (pt. II.B.3.), concerning the readback testimony relating to whether defendant possessed his gun after he returned to Williams's apartment immediately after the Subway crimes were committed. Namely, defendant contends that the allegedly improper material that was read back at the first trial "contributed to the convictions in a capital case, [and hence] the judgment is not sufficiently reliable to satisfy the Eighth Amendment. (*Beck v. Alabama* [(1980)] 447 U.S. 625, 637–638 [65 L.Ed.2d 392, 100 S.Ct. 2382]." We disagree. For the reasons set forth in part II.A.1.a., any error was nonprejudicial as to the guilt convictions and special circumstance findings, and we perceive no basis upon which to conclude that the resulting penalty judgment is unreliable under the Eighth Amendment.

[27] Essentially the same testimony, covering 39 transcript pages, had been admitted, without objection, at the first penalty phase trial. The sole substantive difference in the testimony given at the two proceedings is that, in the retried penalty proceedings, two of the witnesses—Brian Berry's father and James White's mother—testified briefly concerning the mental images they held of the victims kneeling and pleading for their lives before they were executed. (See *post*, at pp. 645 & 648–649.)

Brian Berry's father, Jan Stephen Berry, began with a detailed account of how he and his wife learned of their son's death:

"It was eight o'clock on Sunday morning, the 30th of June, and we were awakened by a knocking by the sheriff at our cabin door in Big Bear. All he told us was to call home about a death in the family. [¶] . . . [M]y first thought was that it was probably news of one of my parents. I said that to Terry [his wife], but as I said it to her she started to cry and said, oh, my God, our children. That was unthinkable to me, and I couldn't give it any consideration or credence at all. [¶] We had been together just that Saturday before kidding around at home, having fun, and enjoying grandma's visit from Northern California. Everybody was fine. [¶] We didn't have a phone in the cabin so we drove to a phone booth outside a little restaurant on Highway 18. Terry and I squeezed into the phone booth, and I placed a call to our home. [¶] It was a little breath of sunshine and heaven when Shannon [his daughter] answered the phone. I said Hi Shannon so her mom could hear her voice and know that she was okay. I groped for words to ask what had happened. [¶] Shannon said that Brian had been killed. And I was stunned, I couldn't believe what I had heard. I asked if there had been a traffic accident. She said no. Then I continued to try and ask questions as she struggled to try and tell me what had happened. [¶] After several repeats and repeats and repeats I could understand what she was trying to tell us. She was trying to tell us that Brian had been killed, he had been murdered at the Subway Sandwich Shop where Jimmy [James White] had worked. Jimmy had been killed also. [¶] Numb and shaken I told her that I loved her, that we'd be home as soon as we could. [¶] Terry and I stood in that little tiny phone booth screaming and crying for a long while. Finally, we went back to our car and we sat and cried and screamed and carried on trying to comprehend what we had been told. It was a long time before we could get ourselves together enough to drive back to the cabin. [¶] When we finally headed home, it was in numb shock and disbelief. How could this be? It couldn't possibly be true."

Mr. Berry also described the impact of his son's death on the family:

"Words absolutely fail to convey the devastation. It's like trying to describe seeing to a blind person or music to someone who can't hear. [¶] We hear terrible things on the news every day. You just can't imagine what the impact is until it is our leg amputated or our 18 year-old-son killed. It is pain like I have never known before in my life. [¶] His dreams of life and adventure gone. We struggled to help him learn and grow. For what? The sharing of his joys and sorrows, gone. All his potential, gone. The hope of someday his children to love and share, gone. The friends he had yet to make we'll never know the extent of this loss. The friends left behind, empty and

hurting and asking why. [¶] Our family torn apart, struggling to accept an unacceptable loss. [¶] His twin sister alone after being there for each other all their lives. They were so different from one another, yet such good friends. [¶] Even though he was 18 years old and now an adult, as a father you always feel that you are there to protect your children and it is very difficult to think that at the time when he most needed somebody I couldn't be there to help him. How can I ever escape the image of my son's terror as he defenselessly pleaded for his life and not by accident, not in anger, not in fear, but for a few hundred dollars someone could look my son in the eye, and without feeling or mercy, in a point-blank range shoot him in the face, then put the gun against the side of his head and shoot him again.[28] [¶] The family and friends and church family and counseling and prayer, books. Almost three years the grief goes on, and I guess it will the rest of my life."

Brian Berry's twin sister, Shannon, described the telephone conversation in which she had revealed her brother's murder to her parents, the especially close relationship she had had with her brother, and the impact of her brother's death upon her:

"I can't even say everything that it's impacted. It impacted everything. From going to having a built-in best friend, I'm alone. I don't have my brother, my other half. My birthdays aren't a celebration anymore. I can't share them with the person I shared them with for 18 years. Instead of celebrating birthdays I have to mourn on them. [¶] All the things that I want to share with him I have to go to the cemetery. I bought a new car, and I took it to the cemetery to show my brother. [¶] There [are] so many things that we had left to share: getting married and having kids. And having family barbeques. And all those things that brothers and sisters are supposed to do together. [¶] And I think about when my parents die, I always expected him to be there for me and for me to be there for him, and now I'm all alone. [¶] I have this huge empty hole inside of me, and I'm searching for something to fill it. I have five animals now because nothing can fill that hole. [¶] I have fallen two years behind in college because school isn't important anymore. Things that used to matter to me don't. My life is revolving around court date after court date, trial after trial. [¶] I have been through therapy for three

---

[28] Contrary to defendant's claims, the testimony concerning Mr. Berry's mental image of his son "pleading" for his life prior to being executed at point-blank range, as well as Mrs. White's additional testimony concerning her own mental image of her son pleading while " 'on his knees' " before being executed (see *post*, at p. 649), was reasonably based upon the evidence. That evidence included: (a) the testimony of the deputy medical examiner, Dr. Rogers, who explained that White's wound was consistent with having been shot while in a kneeling position; (b) the testimony that defendant had told his friends that, in carrying out the planned robbery, he would need to execute any witnesses; and (c) the testimony of Ostrander, who recounted that defendant had told him that he had "popped" the victims by shooting them in the head while they pleaded not to be shot.

years. I went through a session of teenage grief group. I have been to Compassionate Friends. I have been to support groups in therapy. Nothing makes it better. Everything that used to be is gone. Nothing is the same and nothing ever will be. [¶] My friends don't know how to relate to me. I'm 21 years old, and I feel like I'm 40. [¶] Things that young people are supposed to care about don't matter. My world is gone."

Brian Berry's mother, Terry Lynn Berry, described the conversation in which her daughter told her parents of the murders, the close relationship she had with her son, her son's many exceptional qualities, and her pride in him. Finally, she described the impact of her son's death on herself and her family:

"I don't know how a mom can put into words what it's like to have a child murdered. There are no words that can fully explain the impact. And no one can truly understand unless you, too, have a child die. [¶] Brian had many goals and many dreams for his future. He will never be able to fulfill those goals. His life was taken away from him. The possibility of marriage and children, all gone. His career and goals and plans will never become a reality. [¶] Brian and Shannon had always planned to spend time together when they had families of their own. They would go on vacations together, summer barbeques, all of those precious family things that people always do, and she doesn't have anybody to share that with now. [¶] When the future for your child has been destroyed, then all the hopes and dreams that you have for your child and yourself are gone. [¶] Brian Berry and James White were childhood friends. They became friends in the fourth grade. Their friendship remained strong through elementary, junior high and senior high school. They were like brothers. They had plans to share an apartment and life's experiences together, but instead, they died together. [¶] Brian was one of my dearest friends. When I needed a shoulder to lean on, or someone to talk to, he was there for me. We had our special time when he would come home from work, and we'd sit on the porch and we would share the day's events and feelings about good things or bad things. But that was a very special time for me and these, too, are gone. I don't have those precious times anymore. [¶] When your child dies, a large part of you dies too. The hole that's left in your heart never heals. The emptiness cannot be explained but only experienced. So many lives have been devastated by Brian['s] and Jimmy's tragic and senseless death[s]. My life has been destroyed. [¶] Yesterday was Mother's Day. I should have been able to be at home with both of my children to celebrate the joy of being a mom, but instead I had to go to the cemetery to thank Brian for 18 years. I, too, have been in and out of therapy for the last two and a half years, but I still can't find any joy. I find only sorrow and pain. I have become a member of Compassionate Friends hoping to find some peace and understanding, but that's difficult too. [¶] I wish I could tell you many stories about my darling Brian, my beloved son, so that you would know and understand the love that we share. And I pray that no

other family will ever stand before you as we have and that you may never know the pain and heartache that we live with each and every day."

Thereafter, James White's mother, Mrs. Kristine White, testified. The prosecutor asked her to describe how she learned of her son's fatal injury. Because her son did not die immediately from his wound, the police took Mrs. White and her daughters to the hospital where James was being treated. Mrs. White described in detail holding her son in that setting, talking to him, and crying as he died. She then described her emotional reactions immediately after his death, explaining that she kept her son's possessions in his room and that she sleeps with his teddy bear for comfort. Asked by the prosecutor to describe the impact of her son's death upon herself and her family "at this time," Mrs. White testified:

"Even though the boys are gone, James is gone, they are still here (indicating) with us always. [¶] You miss them always. Every part of your life is touched by that missing family. [¶] You still love them. That love still goes on. You search for ways to express it even though they are not there so you talk to the air, you talk to his teddy bear, you talk to them when things remind you of them and hope that they can hear you. [¶] I miss his love. I miss his big smiles and his hugs. I miss the fun and the companionship. [¶] I miss the dirty socks on the floor that I was forever complaining about and picking up. The holidays, birthdays, special things are never going to be the same. Life will never be the same. [¶] You go shopping and looking at a box of Ritz crackers, it's Jimmy. [¶] Songs you hear on the radio. Roxanne I can remember him singing. His sisters wear his clothes, T-shirts to sleep in. Jackie, who was eight at the time, now 11, has an old tennis shoe that she dug out of her trash and keeps in the drawer. She doesn't know that I know she has it there. Old empty gum wrappers she has in a drawer. [¶] I'm an elementary [school] principal and every little blond boy that's slightly pigeon-toed reminds me of my son. [¶] I try to picture what he'd be like at 22 now: If his face would be different. If you would be able to see that moustache that you could hardly see before. If he would still be as skinny. [¶] He'd probably be going to Northridge now working on his teaching credentials. He wanted to be a history teacher in high school. I think he would have been a good one. [¶] Forgive me for having notes. It's real hard being up here and there [are] so many things I want to share with you. [¶] I worry about my mom and my dad who loved him dearly. My dad was more like a father to him than anyone else in the world. [¶] It is hard even to go to church because everything in church reminds you when you cry in front of strangers, and I hate to cry in front of strangers, and here I am crying in front of you. [¶] You feel out of sync with the world. You spend a lot of time alone. You become more and more like a hermit because your friends don't understand. My family is the only one that does, and the Berry's, and the boys' friends. [¶] I cry reading stories in the newspapers. I can't watch TV like 'Rescue 911'

because those are real people, and I start thinking about the person, what they went through, the families, what they are going through. [¶] Your friends expect you to be over it. They don't realize that you never are. [¶] In life you look forward to certain things happening. Jenny is 15 now. She was with me here the other day. I am still trying to screen things from her as far as all of this. [¶] I had looked forward to her dating and seeing Jimmy being the big brother and teasing her about it. Jackie is graduating from 6th grade. Jimmy should have been there for that. [¶] I looked forward to him getting married, becoming a father. He would have been a great dad. He was a wonderful brother, a wonderful son. He would have been a great teacher and helped lots of other people in the world. [¶] This trial itself, the whole legal process, is very bewildering. I sit here and listen to the facts of the case and know it's my son, my little boy. [¶] All of these things that you have heard about replay in our minds like videotape, the events of what happened at Subway. I can see James and what his terror must have been like in seeing his best friend shot. How afraid he must have been on his knees asking for his life.[29] I can feel the gun to his head. To this day I don't understand how I slept so soundly and didn't know. You'd think that you would. [¶] I don't understand anybody being able to do that. [¶] I can hear him moaning as he lay on the ground and bled from his wound and there wasn't anybody there to help him. [¶] Jackie, the 11 year old, asked me a couple of weeks ago if I ever wished that I was dead so that I could be with Jimmy. I had to tell her yes. But she had to have that thought herself to be able to ask me. This is an 11 year old girl. [¶] She believes like I do, that there is life after this one. And sometimes I long to be there because I miss my son so much. [¶] I wonder if he will look the same in heaven. I wonder if I will be able to hug him. [¶] They have that saying that time heals all wounds. That's not true. You just go on hurting. You just go on missing, longing. It never goes away. It still feels like a nightmare. Sometimes I wish I could just turn the clock back and it would all go away. It seems like yesterday and it's been three years. [¶] I can close my eyes, and I can see him so clearly walking into the room with his big smile and saying, 'Hi Mom, I'm going to Brian's,' and holding out his hands to give me a hug. [¶] There really aren't words to express what it's like to go through what we have, and I pray that none of you will ever know what it's like. With all my heart I pray that for you. [¶] That's it."

Beyond the representative passages quoted *ante*, each of the four witnesses gave additional, similar testimony concerning various other aspects of their grief. And, in the course of the above testimony, the prosecution also introduced—again without objection—22 photographs of the victims taken while they were alive. Most of the photos showed the victims with their families, many depicting them in early childhood.[30]

---

[29] See footnote 28, *ante.*

[30] The same 22 photographs had been introduced at the first penalty phase trial.

The prosecutor, in his closing argument, referred to the suffering of the Berry and White families and contrasted that with what he asserted was a lack of "remorse" or "humanity" on the part of defendant. The prosecutor also argued that, whereas defendant could receive visits from his family while he was in prison, the victims' families could "visit" their sons only at the cemetery and asserted that the jury should "take that into account."

Defendant acknowledges that so-called victim impact evidence may be introduced at penalty phase proceedings under the federal Constitution (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*)) and that we also have found such evidence (and related "victim character" evidence) admissible as a "circumstance of the crime" under section 190.3, factor (a). (*Roldan, supra,* 35 Cal.4th 646, 730–731; *People v. Panah* (2005) 35 Cal.4th 395, 494–495 [25 Cal.Rptr.3d 672, 107 P.3d 790] (*Panah*); *People v. Benavides* (2005) 35 Cal.4th 69, 107 [24 Cal.Rptr.3d 507, 105 P.3d 1099] (*Benavides*); *People v. Brown* (2004) 33 Cal.4th 382, 396–398 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown II*); *People v. Pollock* (2004) 32 Cal.4th 1153, 1181 [13 Cal.Rptr.3d 34, 89 P.3d 353] (*Pollock*); *People v. Edwards* (1991) 54 Cal.3d 787, 832–836 [1 Cal.Rptr.2d 696, 819 P.2d 436] (*Edwards*).) Defendant contends, however, that the testimony and photographic evidence described *ante* should have been excluded because it was partially irrelevant, largely cumulative, and "so unduly prejudicial that it render[ed] the trial fundamentally unfair" (*Payne, supra,* 501 U.S. 808, 825) and/or constituted " 'irrelevant information or inflammatory rhetoric that divert[ed] the jury's attention from its proper role or invite[d] an irrational, purely subjective response . . . .' " (*Edwards, supra,* 54 Cal.3d at p. 836; see also *Roldan, supra,* 35 Cal.4th at pp. 732–733; *Panah, supra,* 35 Cal.4th at pp. 494–495; *People v. Taylor* (2001) 26 Cal.4th 1155, 1172 [113 Cal.Rptr.2d 827, 34 P.3d 937].)[31]

---

[31] In making these arguments and advancing his claim that "[t]estimony or photos revealing admirable aspects of the victims' character, and/or indicating that the victim's loss will be unusually difficult for the family or community are especially prejudicial and inappropriate," petitioner relies upon *Smith v. State* (Tex.Crim.App. 1996) 919 S.W.2d 96. Defendant asserts in his opening brief that the appellate court in *Smith* "found *reversible error* when the trial court had allowed the victim's sister and one of the victim's friends to testify about the victim's good qualities, her education and ambitions and the effect her death had on her students." (Citing *Smith, supra,* at p. 97, italics added.) In his reply brief, defendant repeats the same assertion concerning the *Smith* case. This characterization of the *Smith* decision is misleading. Although the court in *Smith* found introduction of such evidence to be error under the applicable state statute (*id.*, at p. 102), it did *not* find that the error warranted reversal, but instead that the error was harmless. (*Id.*, at p. 103.) Moreover, two years later, the Texas court reconsidered *Smith* and reversed that decision on the question of error, stating in *Mosley v. State* (Tex.Crim.App. 1998) 983 S.W.2d 249, 262: "We take this opportunity to announce a consistent, if not always clear-cut rule to be followed in future cases: Both victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show

In *Payne*, the high court held that the Eighth Amendment does not per se *bar* introduction of victim-impact testimony. Such testimony in *Payne* consisted of a single response to a question posed to a witness who was the mother and grandmother of the two victims. The witness was asked how a surviving young child had been affected by the murders of his mother and sister, which had been committed in his presence. The witness responded: " 'He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmamma, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie.' " (*Payne, supra*, 501 U.S. 808, 814–815.)

Upholding the introduction of this evidence and the prosecutor's subsequent argument based upon it, the high court in *Payne* reasoned that, just as a jury must be allowed to consider mitigating evidence introduced by a defendant, the prosecution " 'has a legitimate interest in counteracting' " that mitigating evidence, and hence a jury also should be allowed to consider in aggravation "the specific harm caused by the crime in question." (*Payne, supra*, 501 U.S. 808, 825.) The court rejected the view that such evidence often or even generally "leads to the arbitrary imposition of the death penalty," but observed that if, in a given case, such evidence "is so unduly prejudicial that it renders the trial fundamentally unfair," such a sentence will be overturned on constitutional due process grounds. (*Ibid.*)

Addressing this point shortly after *Payne* was decided, we concluded in *Edwards, supra,* 54 Cal.3d 787, that photographs of crime victims while they were alive properly had been admitted under *Payne* and as "circumstances of the crime" under section 190.3, factor (a). We explained that the quoted phrase ("circumstances of the crime") "does not mean merely the immediate temporal and spatial circumstances of the crime," but "[r]ather . . . extends to '[t]hat which surrounds materially, morally, or logically' the crime." (*Edwards, supra,* 54 Cal.3d at p. 833.) We also cautioned, however, that allowing such evidence under factor (a) "does not mean that there are no limits on emotional evidence and argument," and we quoted with approval our pre-*Payne* observations that (1) " 'the jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason,' " and that (2) although a court should " 'allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction,' " still, " 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational,

---

the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence."

purely subjective response should be curtailed.' " (*Edwards, supra,* 54 Cal.3d 787, 836, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776].)

In this vein, defendant relies upon the decision of the Oklahoma Court of Criminal Appeals in *Cargle v. State* (1996) 1995 OKCR 77 [909 P.2d 806], which stated: "The more a jury is exposed to the emotional aspects of a victim's death, the less likely [its] verdict will be a 'reasoned moral response' to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process." (*Id.,* at p. 830.)

One extreme example of such a due process infirmity is *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330. In that murder trial, the court admitted a 17-minute "video montage" tribute to the murder victim—approximately 140 photographs set to emotional music, including "My Heart Will Go On," sung by Celine Dion and featured prominently in the film Titanic (20th Century Fox 1997). (*Id.,* at pp. 333–334.) Reversing a lower appellate court decision finding the presentation admissible, the Texas Court of Criminal Appeals remanded for an assessment of prejudice. In so ruling, the state high court observed, among other things, that "the punishment phase of a criminal trial is not a memorial service for the victim. What may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial" (*id.,* at pp. 335–336), and that *"we caution that victim impact and character evidence may become unfairly prejudicial through sheer volume.* Even if not technically cumulative, an undue amount of this type of evidence can result in unfair prejudice . . . . Hence, *we encourage trial courts to place appropriate limits upon the amount, kind, and source of victim impact and character evidence."* (*Id.,* at p. 336, italics in original.)[32]

We need not, and do not, decide in this case whether evidence of the nature and extent presented below properly was admitted at the penalty phase of this capital trial. Defense counsel knew that most of this same evidence had been received at the first trial (see fns. 27 & 30, *ante*), and hence easily could have brought an in limine motion to restrict the admission of this evidence. By failing to do so, or to object when the testimony and the photographs were offered at the retried penalty proceedings, defendant has waived the issue on appeal. (Evid. Code, § 353, subd. (a); *Roldan, supra,* 35 Cal.4th 646, 732; *Benavides, supra,* 35 Cal.4th 69, 106; *Pollock, supra,* 32 Cal.4th 1153, 1181–1182; *People v. Crew* (2003) 31 Cal.4th 822, 845 [3 Cal.Rptr.3d 733, 74 P.3d 820].)[33]

---

[32] After remand, the Texas Court of Criminal Appeals found the error prejudicial and ordered a new sentencing trial. (*Salazar v. State* (Tex.Crim.App. 2003) 118 S.W.3d 880.)

[33] Defendant also contends that, because the family members were not physically present at the scene when the crimes were committed, their resulting testimony did not constitute

### 5.  *Routine instructional and constitutional challenges*

#### a.  *Refusal to instruct on "lingering doubt"*

Defendant submitted, and the trial court rejected, two alternative special instructions that specifically would have informed the jury that it was permitted to consider, in mitigation of penalty, any lingering doubt as to defendant's guilt. In denying this request, the trial court observed that defense counsel would not be precluded from "arguing lingering doubt." Subsequently, in closing arguments, the prosecutor asserted that the jury should have no lingering doubt concerning defendant's guilt, and urged the jury to "ignore" any argument that defense counsel might make to the contrary. Defense counsel thereafter argued forcefully (without objection, and contrary to what the prosecutor had urged) that the jury could and should have a lingering doubt about defendant's guilt. Indeed, counsel spent half of his argument reviewing the guilt phase evidence in an attempt to raise doubts regarding the earlier determination of guilt and strongly asserted that the jury should act upon such doubt by viewing it as an important factor that weighed against a punishment of death. Subsequently, the court instructed the jury, pursuant to section 190.3, factor (k), to consider in determining the appropriate penalty "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record as a basis for [a] sentence less than death . . . ."

We repeatedly have rejected claims that, under either state or federal law, a trial court must instruct concerning lingering doubt, whether on the court's own motion or in response to a specific request. (E.g., *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219 [120 Cal.Rptr.2d 477, 47 P.3d 262] [failure to instruct on own motion]; *People v. Millwee, supra,* 18 Cal.4th 96, 165–166 (*Millwee*) [same]; *People v. Brown* (2003) 31 Cal.4th 518, 567–568 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [refusal of requested instructions]; *People v. Lawley* (2002) 27 Cal.4th 102, 166 [115 Cal.Rptr.2d 614, 38 P.3d 461]

---

evidence of the circumstances of the crimes under section 190.3, factor (a). This claim also was not raised below and similarly is forfeited on appeal. In any event, we never have required such a nexus. (See *Brown II, supra,* 33 Cal.4th 382, 398 ["We find no authority for such a rule, which would eliminate the vast majority of victim impact evidence in murder cases—a result inconsistent with the underlying rationale of *Payne* . . . ."]; see also *Pollock, supra,* 32 Cal.4th 1153, 1183.) Defendant further suggests that victim impact evidence must be limited to facts or circumstances known to the defendant at the time of the crimes. Again, this claim, not raised below, is forfeited on appeal. In any event, we have approved the admission of such evidence in circumstances in which the defendant had no prior knowledge of the victim. (*Brown II, supra,* 33 Cal.4th at pp. 389, 397–398.) As the People observe, although defendant may not have known the precise dimensions of the tragedy his actions would leave behind, the profound harm to surviving family members and friends was "so foreseeable as to be virtually inevitable." (*Payne, supra,* 501 U.S. 808, 838 (conc. opn. of Souter, J.).)

[same]; *People v. Staten* (2000) 24 Cal.4th 434, 464 [101 Cal.Rptr.2d 213, 11 P.3d 968] [same]; *People v. Hines* (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388] [same]; *People v. Sanchez* (1995) 12 Cal.4th 1, 77–78 [47 Cal.Rptr.2d 843, 906 P.2d 1129], and cases cited [same].) We perceive no reason to reconsider those determinations here. Moreover, we observe that, consistent with defense counsel's closing arguments, the jury was allowed under the section 190.3 factor (k) instruction to consider in mitigation any lingering doubt it may have had. (See, e.g., *People v. Brown, supra,* 31 Cal.4th at pp. 567–568; *People v. Lawley, supra,* 27 Cal.4th at p. 166; *People v. Hines, supra,* 15 Cal.4th at p. 1068; *People v. Sanchez, supra,* 12 Cal.4th at p. 77.)

b. *The asserted need for jury unanimity based upon findings, beyond a reasonable doubt, concerning the presence of one or more aggravating factors*

Defendant contends that a death judgment is invalid under the federal Constitution unless the jury finds beyond a reasonable doubt that a particular aggravating factor exists, unanimously agrees upon the applicable aggravating factor or factors, and submits written findings specifying the applicable aggravating circumstances. Defendant concedes that we repeatedly have considered, rejected, and declined to reconsider these and related claims in numerous prior decisions (e.g., *Millwee, supra,* 18 Cal.4th 96, 164 [declining the defendant's request to reconsider our "prior decisions—too numerous to cite here" upholding the statutory scheme against the same challenges]), but argues that the high court's decision in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], viewed together with its earlier decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], requires us to reconsider our prior determinations. In his reply brief, defendant acknowledges that we declined to do precisely that in post-*Apprendi* decisions (e.g., *People v. Ochoa* (2001) 26 Cal.4th 398, 453–454 [110 Cal.Rptr.2d 324, 28 P.3d 78]) and in two post-*Ring* decisions (*People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123] (*Prieto*); *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32 [132 Cal.Rptr.2d 271, 65 P.3d 749]), but requests that we reconsider and provides copious argument for his position. We decline to do so. (See *People v. Dickey* (2005) 35 Cal.4th 884, 930–931 [28 Cal.Rptr.3d 647]; *Panah, supra,* 35 Cal.4th 395, 499–500; *People v. Young* (2005) 34 Cal.4th 1149, 1207–1208 [24 Cal.Rptr.3d 112, 105 P.3d 487]; *Cleveland, supra,* 32 Cal.4th 704, 765; *People v. Martinez* (2003) 31 Cal.4th 673, 700–701 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *People v. Nakahara* (2003) 30 Cal.4th 705, 721–722 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *Maury, supra,* 30 Cal.4th 342, 440, fn. 25.)

### c. *Other structural challenges*

Defendant advances some of the standard challenges to the constitutionality of the California death penalty statute. We reject them for the same reasons that repeatedly have led us to reject identical claims. (See, e.g., *Panah, supra,* 35 Cal.4th 395, 499–500.) First, section 190.3 adequately narrows the class of death-eligible offenders. (E.g., *People v. Griffin* (2004) 33 Cal.4th 536, 596 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *Prieto, supra,* 30 Cal.4th 226, 276; *People v. Samayoa* (1997) 15 Cal.4th 795, 863 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Second, section 190.3, factor (a) is not impermissibly overbroad facially or as applied. (E.g., *Brown II, supra,* 33 Cal.4th 382, 401; *Lewis, supra,* 26 Cal.4th 334, 394; *Jenkins, supra,* 22 Cal.4th 900, 1050–1053.) Finally, the statute is not unconstitutional because (with the exception of evidence of other crimes) it lacks a requirement that the jury make written findings or be given "burden of proof" or "standard of proof" instructions concerning aggravating and mitigating circumstances in reaching a penalty determination; nor is the statute infirm for failing to require that all aggravating factors be proved beyond a reasonable doubt, that such factors must outweigh factors in mitigation beyond a reasonable doubt, or that death must be found to be an appropriate penalty beyond a reasonable doubt. (E.g., *People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Welch* (1999) 20 Cal.4th 701, 767 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

### 6. *Asserted cumulative error*

Defendant contends that alleged cumulative error at each trial requires reversal of the penalty judgment. We previously have rejected a similar contention insofar as the guilt and special circumstances phase of the trial is concerned. We have not found any error at the penalty phase of the proceedings, but even assuming error (and, indeed, cumulative error), any such improprieties would have been harmless under the "reasonable possibility" test of *Brown, supra,* 46 Cal.3d 432, 448, and under the "beyond a reasonable doubt" test of *Chapman, supra,* 386 U.S. 18, 23–24. The record reflects that defendant received a fair trial.

### III. Conclusion

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J.,[*] concurred.

---

[*]Associate Justice, Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**MORENO, J.,** Concurring.—I concur in the majority opinion. The majority correctly concludes that defendant has waived the issue of whether the nature and extent of the victim impact evidence presented was properly admitted, because defense counsel failed to bring an in limine motion to restrict admission of the evidence. (Maj. opn., *ante*, at p. 652; see *People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353] [trial counsel successfully moved to limit the scope of the victim impact testimony before the commencement of such testimony].) Although the majority does not decide the merits of defendant's claim, I write separately to express my view that a certain type of testimony by the victims' families in this case was not properly admissible as victim impact evidence.

The proper purpose of victim impact evidence was set forth in *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*). In approving the very brief victim impact testimony in that case, the court stated: " '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Id.* at p. 825.)

The court in *Payne*, although overruling *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] (*Booth*) to the extent that it mandated exclusion of victim impact evidence, left intact *Booth*'s holding that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." (*Payne, supra,* 501 U.S. at p. 830, fn. 2; see also *People v. Pollock, supra,* 32 Cal.4th at p. 1180.) *Booth*, in explaining why the admission of such characterization and opinion evidence was unconstitutional, stated: "One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." (*Booth, supra,* 482 U.S. at p. 508.)

In the present case, I find parts of the victim impact testimony crossed the line between proper victim impact testimony and improper characterization and opinion by the victim's family. The prime example was that of Brian Berry's father, Jan Stephan Berry, who testified: " 'Even though [Brian] was 18 years old and now an adult, as a father you always feel that you are there to protect your children and it is very difficult to think that at the time when he most needed somebody I couldn't be there to help him. *How can I ever*

*escape the image of my son's terror as he defenselessly pleaded for his life and not by accident, not in anger, not in fear, but for a few hundred dollars someone could look my son in the eye, and without feeling or mercy, in a point-blank range shoot him in the face, then put the gun against the side of his head and shoot him again.'* " (Maj. opn., *ante*, at p. 646, fn. omitted, italics added.) The above passage is only minimally related to the valid purpose of reminding the jury " 'that the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Payne, supra*, 501 U.S. at p. 825.) Rather, it is quite plainly "the admission of a victim's family members' characterizations and opinions about the crime [and] the defendant," which violates the Eighth Amendment. (*Payne, supra*, 501 U.S. at p. 830, fn. 2.)

A similar statement was made by James White's mother, Kristine White. As she stated: " 'All of these things that you have heard about replay in our minds like videotape, the events of what happened at Subway. *I can see James and what his terror must have been like in seeing his best friend shot. How afraid he must have been on his knees asking for his life. I can feel the gun to his head.* To this day I don't understand how I slept so soundly and didn't know. You'd think that you would. [¶] *I don't understand anybody being able to do that.* [¶] *I can hear him moaning as he lay on the ground and bled from his wound and there wasn't anybody there to help him.'* " (Maj. opn., *ante*, p. 649, fn. omitted, italics added.)

The above statement, again, is only minimally related to the purpose of victim impact evidence discussed *ante*. Rather, it allowed the parent of the victim to invoke an imagined version of the crime, the version that was the most horrific, and that was in alignment with the prosecutor's theory of the murders.[1] Although the above statement may have been couched in the language of victim impact testimony, i.e., in terms of a "videotape" running in the mind of the victim's mother, that "videotape" was in fact a simile for a series of recurrent thoughts she had based on things she had "heard about." Those thoughts in turn were essentially characterizations of and opinions about the crime and defendant, the primary effect of which would be to "inflame the jury" (*Booth, supra*, 482 U.S. at p. 508) in order to elicit from it the maximum penalty.

In fact, I would hold as a general rule that testimony of victims' friends and family regarding their imagined reenactments of the crime be excluded. Such testimony is too far removed from victim impact evidence's central

---

[1] Although the majority is correct that White's statement is not inconsistent with the evidence at trial, neither does that evidence, chiefly Dennis Ostrander's account of what defendant told him about the crimes, compel the conclusion that the murders occurred in the manner that White, and the prosecutor during closing argument, described them.

purpose of explaining the loss to the family and society that resulted from the victim's death, and can too easily lend itself to improper characterization and opinion of the crime and defendant, to pass muster under the Eighth Amendment. Of course, if the victim impact witness actually witnessed the crime occurring, such testimony would be admissible. (See *People v. Fierro* (1991) 1 Cal.4th 173, 234–235 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Because defendant has waived the issue on appeal, there is no occasion to decide whether the above erroneous admissions were prejudicial, nor whether there are other parts of the victim impact testimony in this case that should have been excluded.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied February 22, 2006.